**UNITED STATES of America,**

v.

**James HARRIS, aka James Harris Glenn, Jr., Movant.**

**Crim. A. No. 91–0197 (RCL).**

United States District Court,
District of Columbia.

March 1, 1994.

Gregory Poe, Leonard, Street & Dienard, Minneapolis, MN, Michell Rogovin, Donovan, Leisure, Newton & Irvine, Washington, DC, for movant.

Barry Wiegard, U.S. Atty's. Office, Washington, DC, for U.S.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

### I. Introduction

A jury found movant guilty of possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B)(iii). Following the four-day jury trial in this case, this court received the following letter in chambers on August 26, 1991:

August 23, 1991

The Honorable Royce C. Lambert[h]
U.S. District Court
3rd St. & Constitution Ave., N.W.
Washington, D.C. 20001

RE: D.C. vs. James Glenn aka Harris
C.A. No.: 91–0197

Dear Judge Lambert[h]:

This letter is concerning the case of D.C. vs. Harris, in which Mr. Harris was found guilty of possession of cocaine on July 12, 1991. I am Mr. Harris' aunt and he has asked me to write this letter to you on his behalf.

After the trial my nephew learned that his attorney Betty Hunter has been having an affair with one [of] the police officer[s] who testified against him at trial. At no time before or during the trial did Miss Hunter ever tell my nephew that she was having an affair with one of the witness[es]. My nephew do[es] not believe that anyone was aware of this relationship at the time of the trial. Mr. Harris wants a hearing on this matter so that the Court will have an opportunity to determine whether a new trial should be given to him. I have made several phone calls to Miss Hunter to give her a chance to explain why this information was not brought to the Court's or the Movant's attention. Miss Hunter has even failed to contact the Movant to keep him abreast on the sentencing or on appeal.

Please accept this letter as my nephew['s] request for a hearing on this problem and for a new trial based upon the representation of Ms. Hunter. My nephew has the name of the police officer who was involved with Ms. Hunter, which wil[l] be brought out [at] a later date. I am writing this letter for my nephew as he does not have a lawyer other than Miss Hunter whose advice he no longer trusts. Please help Mr. Harris.

Thanking you for your time and attention in this matter, I am,

Very truly yours,
Williemae Odom

At the October 2, 1991 presentencing, this court questioned Mr. Harris on the record about this letter.[1] Subsequent to this colloquy, movant agreed to continued representation by Ms. Hunter. Mr. Harris was sentenced on October 8, 1991 to 97 months of incarceration and four years of supervised release on count one of an April 11, 1991 indictment. The judgment of conviction under attack by this motion was entered on October 10, 1991.[2]

James William Harris now moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[3] Mr. Harris claims that his attorney acted with "divided loyalties." Mr. Harris' trial counsel, Ms. Betty M. Hunter, *was* involved in a longstanding, adulterous affair with a police officer who

---

1. On August 27, 1991, this court directed the courtroom clerk to file this letter in the court file and to provide a copy to the United States Attorney and to defense counsel.

2. The movant is currently in the custody of the United States Bureau of Prisons, Federal Correctional Institution, Morgantown, West Virginia.

3. The relevant portion of § 2255 provides as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C.A. § 2255 (1970).

testified on behalf of the government at Mr. Harris' trial. Ms. Hunter also has personal relationships with other testifying officers who participated in the execution of the warrant leading to Mr. Harris' arrest. Movant suggests that Ms. Hunter's failure to disclose the nature and extent of her conflict of interest to Mr. Harris or the Court at any time denied him effective assistance of counsel in violation of the Sixth Amendment and denied him a fair trial.

## II. History of this Motion

On October 17, 1991, movant filed a notice of appeal from his conviction and sentence. That appeal is pending in the United States Court of Appeals for the District of Columbia. By order of that court dated April 15, 1992, the appeal is being held in abeyance pending the filing and disposition of this motion.

On February 12, 1993, this court temporarily granted a motion to file and conduct proceedings under seal. On March 12, 1993, the court sealed this matter until further order by the court. Also on March 12, 1993, the court signed an order permitting movant to take the deposition of Ms. Hunter. On May 19, 1993, the court allowed the movant to depose Officer Muzzatti. Interviews of other Fifth District police officers were conducted pursuant to a stipulation of counsel. On January 12, 1994, this court held an unsealed hearing in open court on this § 2255 motion. The court took this matter under advisement, keeping the findings and documents under seal pending further order of the court. The government suggests that the discovery allowed regarding this § 2255 motion should be kept under seal because of

the privacy interests of the principal players in this case. This court rejects this argument. The participants' privacy interest is outweighed by the need for public awareness of the facts of this case in light of the court's decision today to grant the movant's motion. Today, in a separate order, this court unseals all materials related to this case.

## III. History of the Case [4]

### A. Arrest and Pretrial

Police arrested movant and his codefendant, Thomas Roger Odom, on March 13, 1991 during the execution of two search warrants at neighboring addresses, 1237 and 1239 Gallatin Street, N.E. Tr. I at 12, 38; Tr. III at 3–119.[5] When the police entered the residence, movant was located in the basement of the house at 1239 Gallatin St. N.E. Tr. III at 3–4. Three other individuals were in the basement at that time: Derrick Johnson, Mark Henderson, and Carl Cooper. *Id.* Henderson and Cooper testified at trial in Mr. Harris' defense. Tr. III at 2; Tr. IIA at 117. Johnson, an unavailable witness, executed an incriminatory statement that was admitted in Mr. Harris' defense. *See* Movant's Suppl.App., Tab 9.[6] Movant's codefendant was seized outside of the house between the 1237 and 1239 Gallatin addresses. Tr. I at 22.

Police discovered 27 small packets of crack cocaine on the basement floor near the door of a rear storage room. The police also found $2,500 in cash, firearm ammunition, and empty ziplock bags in the basement. Movant was the only person in the house arrested and charged.[7]

---

**4.** This court would like to commend Assistant United States Attorney Barry Wiegand and court-appointed attorney Gregory Poe for their considerable efforts in creating the record for this § 2255 motion.

**5.** "Tr. I" refers to the 74–page transcript of the proceedings in movant's trial beginning on July 9, 1991. "Tr. II" refers to the 75–page transcript of the proceedings in movant's trial beginning at 10:00 a.m. on July 10, 1991. "Tr. IIA" refers to the 154–page transcript of the proceedings in movant's trial beginning at 1:50 p.m. on July 10, 1991 and marked "Volume II–A" on the cover. "Tr. III" refers to the 183–page transcript of the

proceedings in defendant's trial beginning on July 11, 1991.

**6.** Johnson, on the advice of counsel, invoked his Fifth Amendment privilege against self-incrimination and did not testify at trial. As a result, he became an unavailable witness. *See* Fed.R.Evid. 804(a); Tr. II at 4–7.

**7.** The evidence against codefendant Odom was that he was seen outside 1239 Gallatin St., N.E., for about an hour before police raided the house. The government's theory of the case was that he was an enforcer for a drug-selling operation.

Numerous Fifth District vice officers were involved in the execution of the warrant that evening. Investigator Donald Bell was the lead officer and the second officer to enter the basement. Tr. II at 63. Officer Stephen Naugle testified that he was the first officer to enter the basement, Tr. I at 59–60, and that he arrested Mr. Harris. *Id.* at 69. Officer Lance Harrison was the crime search officer responsible for the search of the basement area and the rest of the house. *Id.* at 43–44. Officer Bradley Belden was the seizing officer responsible for evidence seized during the raid. Tr. II at 16. Officers Marcello Muzzatti and Kirk Delpo were assigned to cover the rear of 1239 Gallatin Street, N.E. Tr. I at 18, 35. They seized movant's codefendant. *Id.* at 22. They were also involved in the search of the basement area. *Id.* at 26, 38. All of the above-named officers testified at the trial. John Cunningham and Darryl Richmond, along with unidentified uniformed officers, also participated that evening. Tr. III at 70.[8]

The day following Mr. Harris' arrest, Ms. Betty M. Hunter began representing Mr. Harris as court-appointed counsel. After her initial meeting with him on March 14, 1991, Ms. Hunter represented movant throughout pretrial, trial proceedings, and in his presentencing and sentencing.[9]

Before meeting with Mr. Harris, Ms. Hunter questioned Fifth District Officer Marcello Muzzatti, her lover, about his role in the arrest of Mr. Harris.[10] Hunter Dep.

at 30. Officer Muzzatti told her that he had no knowledge of the arrest of James Harris or the arrest activities in the basement. *Id.* at 360. Her understanding was that Officer Muzzatti had only arrested somebody outside the house, *id.* at 69, 71–72, and had never gone inside the house, until later when he took the doorknob off the basement door. *Id.* at 72. She believed that Mr. Harris had been removed from the basement prior to Officer Muzzatti's entry into the basement. *Id.* at 106. At this point, Ms. Hunter "satisfied [her]self, in [her] mind, that [she] could represent Mr. Harris without any ethical problems, because Officer Muzzatti knew nothing about the arrest of Mr. Harris." *Id.* at 78.

B. Trial

Movant and codefendant Odom were tried jointly before this court. At trial, the prosecution hinged on the testimony of the fifth district arresting officers, including Officers Donald Bell, Steven Naugle, and Marcello Muzzatti. Bell and Naugle proved to be the key witnesses in proving the constructive possession charge against Mr. Harris, placing him inside the house at 1239 Gallatin St., N.E.

Officer Muzzatti was the first witness to testify in the government's case in chief. Tr. I at 16–34. Officer Muzzatti assisted the other officers in executing the search warrants. *Id.* at 17–18. While the other officers executed the warrants, Officer Muzzatti,

---

8. The other government witnesses included Officer Gary Curtis, who was sent to conduct surveillance of 1239 Gallatin Street, N.E., before the search warrant was executed. He offered no testimony concerning the defendant. Crime Scene Search Technician William F. Hyatt offered testimony concerning fingerprints, or the lack of them, that he took from the gun and ammunition seized from codefendant Odom, including the fact that the one print found did not belong to either movant or Odom. DEA chemist Michael Morley testified to the chemical analysis of the crack cocaine found in movant's basement. Detective David Stroud was qualified as an expert in narcotics trafficking and gave opinion testimony. Mr. Ravenel Odom, movant's grandfather, testified that movant and a number of family members lived in the house.

9. In particular, Ms. Hunter represented him at his April 22, 1991 arraignment, a May 23, 1991

suppression hearing, the July 9–12, 1991 trial proceedings, the October 2, 1991 presentencing hearing, and the October 8, 1991 sentencing.

 Current counsel for Mr. Harris was appointed by Order of the United States Court of Appeals for the District of Columbia Circuit dated December 16, 1991.

10. Although no formal evidentiary hearing was held to elicit testimony for this § 2255 motion, this court concludes that it must grant a new trial, even accepting Ms. Hunter's testimony as true. Conflicts in affidavit and deposition testimony between Hunter and Harris are not noted throughout the opinion; only Ms. Hunter's testimony is considered with regard to issues such as the nature of her relationship with Officer Muzzatti and the scope of her disclosure to Mr. Harris. Therefore, no evidentiary hearing is required.

along with Officer Delpo, was assigned to cover the rear of the buildings being searched. *Id.* at 18.

Muzzatti heard his colleagues enter the front of 1239 Gallatin St. N.E. *Id.* Muzzatti then heard a door slam and crashing in the bushes, which he took to be someone running. *Id.* A person with a gun came toward him, moving in the yard between the houses at 1237 and 1239 Gallatin. *Id.* The fleeing man, codefendant Odom, apparently slipped and fell, losing the gun. *Id.* at 18–20, 22.

After Odom had been arrested, Muzzatti and Delpo found a key in the codefendant's possession, which fit the back basement door to 1239 Gallatin. *Id.* at 26–27. After finding that Odom's key opened the back basement door, the two officers could not enter the door because "there was some furniture up on top." *Id.* at 27–28. When the furniture had been moved, Delpo and Muzzatti reopened the door, pushed it in, and Muzzatti removed the knob and lock. *Id.* at 28. Muzzatti did not know if the furniture had blocked the door before the search warrant was executed. *Id.* at 28.

In what Ms. Hunter considered to be a surprise twist, Muzzatti testified that he was inside the house at one point during the arrest, thereby possibly bringing him in contact with Harris. Muzzatti stated that he saw none of the dealings defendant had with the other officers conducting the search. *Id.* at 29. The entirety of Ms. Hunter's cross-examination appears below:

> Q. Good afternoon, Officer Muzzatti. I represent Mr. Harris. Did you participate in any way in the arrest of Mr. Harris?
>
> A. No, I did not.
>
> Q. When you testified [on direct examination] that you participated in the search

of the home, how far had the search of the home gotten when you came in?

> A. It had begun. I would guess more than half way.
>
> Q. Did you see any of the dealings with the other police officers with Mr. Harris?
>
> A. No.

Ms. Hunter: I have no further questions. Tr. I at 28–29.

IV. Conflict of Interest

A. Sixth Amendment Jurisprudence

■ The Supreme Court "has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The Sixth Amendment guarantees criminal defendants the right to reasonably effective assistance of counsel. *Id.* at 686, 104 S.Ct. at 2063. Reasonably effective assistance of counsel requires undivided respect for the "duty of loyalty, a duty to avoid conflicts of interest." *Id.* at 688, 104 S.Ct. at 2065 (citing *Cuyler v. Sullivan,* 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980)). This duty of loyalty is "perhaps the most basic of counsel's duties." *Id.* at 692, 104 S.Ct. at 2067.

■ Normally, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no prejudicial effect on the defense. However, some claims of actual ineffectiveness warrant a limited presumption of prejudice. Prejudice is presumed if the movant "establishes that [his] attorney had an *actual conflict* of interest that *adversely affected* the attorney's performance." *Winkler v. Keane,* 7 F.3d 304 (2d Cir.1993) (citing *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719)) (emphasis added).[11] "In these

---

11. Almost all inadequate representation claims due to conflicts of interest arise in multiple representation settings. An attorney's representation of conflicting interests, however, "is not always as apparent as when he formally represents two parties who have hostile interests." *United States v. Tatum,* 943 F.2d 370, 376 (4th Cir.1991). As this case illustrates, issues of conflict of interest may also arise when an attorney's interest conflicts with the interests of his client.

*See, e.g., Wood v. Georgia,* 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981) (potential conflict when "adult" entertainment distributor directly employed and paid defense attorney representing its former employees); *Briguglio v. United States,* 675 F.2d 81, 82–83 (3d Cir.1982) (per curium) (remanding for evidentiary hearing when defendant unaware until after verdict that counsel was under criminal investigation and that prosecutor's office refused to discuss plea

circumstances, no prejudice need be shown because the conflict of interest is assumed to be harmful. Legal representation which is adversely affected by actual conflicts of interest is never considered harmless error." *United States v. Tatum*, 943 F.2d 370 (4th Cir.1991); *United States v. Ellison*, 798 F.2d 1102, 1107 (7th Cir.1986) ("This presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure." (citations omitted)).

### B. Finding of Actual Conflict of Interest

An actual conflict of interest exists "when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" *Winkler*, 7 F.3d at 307 (quoting *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3); *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988) ("An actual conflict of interest 'is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.'" (quoting *Cuyler v. Sullivan*, 723 F.2d 1077, 1086 (3d Cir.1983))). In *Gambino*, Judge Mansmann described this actual conflict of interest as "essentially a tension, a friction, a dissonance, *within* the attorney which does not permit the attorney's single-hearted zealous advocacy on the part of a particular client." *Gambino*, 864 F.2d at 1081 (Mansmann, J., dissenting). He went on to note that "[t]he circumstances surrounding the representation provide the evidence of the conflict." *Id.*

■ Movant argues that trial counsel was inhibited by an actual conflict of interest because of her intimate relationship with Officer Muzzatti.[12] The government's opposition is two-fold. First, the government proffers what this court finds to be an archaic argument: the only personal relationships creating actual conflicts of interest are marriage and family. Second, the government contends that Officer Muzzatti only testified against codefendant Odom, not Mr. Harris. Therefore, there was no actual conflict between Hunter and Mr. Harris vis a vis the persons who testified against him. In making this point, the government goes so far as to suggest that if movant were granted an individual new trial, then Officer Muzzatti would not be a testifying witness. Thus, the argument goes, since Ms. Hunter would not have an actual conflict of interest in this new, hypothetical proceeding, she did not have an actual conflict of interest in the prior matter.

■ This court believes that the focus of the government's scrutiny of this matter is misplaced. A court should direct its inquiry to the nature of the personal relationship rather than at any legal definition of the bond.[13] Thus, a factual examination of the

because of potential invalidation); *United States v. Barnes*, 662 F.2d 777, 782 (D.C.Cir.1980) (remanding for evidentiary hearing when representation at habeas hearing by counsel alleged to have rendered ineffective assistance on appeal would constitute conflict of interest between attorney and defendant); *United States v. Taylor*, 657 F.2d 92, 94 (6th Cir.) (per curiam) (remanding for inquiry to determine whether defendant's attorneys, under investigation for possession of documents taken from US attorney's office, could forcefully pursue client's defense without incriminating themselves further), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981); *United States v. Marrerra*, 768 F.2d 201, 207 (7th Cir.1985) (potential conflict when counsel entered into arrangement with defendant to share proceeds from sale of movie rights of defendant's case), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.) (potential conflict in counsel's book contract concerning Patty Hearst trial), *cert. denied*, 451 U.S. 938, 101 S.Ct.

2018, 68 L.Ed.2d 325 (1980). However, the aforementioned legal principles are applicable to any claim of inadequate representation resulting from a conflict of interest. *United States v. Ellison*, 798 F.2d 1102, 1106–07 (7th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987) (citing *Walberg v. Israel*, 766 F.2d 1071, 1075 (7th Cir.), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985)).

12. Movant also contends that Ms. Hunter's numerous platonic, personal relationships with other Fifth District vice officers creates an actual conflict of interest. This court rejects this argument.

13. One can envision many instances in which the relationship between two persons could create a conflict of interest without the existence of a formal marriage. In today's society, a live-in lover is often the functional equivalent of a spouse. For example, a longstanding, intimate

scope of the Hunter/Muzzatti connection is required.

The extent of the relationship between trial counsel and Officer Muzzatti is at the heart of this matter. During the entire period that Ms. Hunter was representing Mr. Harris, she was involved in an longstanding, adulterous, intimate affair with Officer Muzzatti. App., Tab 4, Lawlor Aff. ¶¶ 4–9.[14] Ms. Hunter admits to having professed her love for Muzzatti before she began representing Mr. Harris. Hunter Aff. at 27. Ms. Hunter was so committed to Mr. Muzzatti that she gave him a key to her home, allowing him to come and go as he pleased. Hunter Dep. at 322. Although Ms. Hunter and Officer Muzzatti were not married, that does not change the nature of their commitment. In fact, although Officer Muzzatti is still married, Ms. Hunter and he have now been together for nearly two years. Suppl.App. Tab 3.

This court finds that defense counsel's substantial personal relationship with an adverse witness in this case establishes an actual conflict of interest. This bond is exactly the type of situation that poses the risk of creating divided loyalties. In short, Ms. Hunter put herself in the unacceptable predicament of cross-examining her latch-key lover on the witness stand: an undesirable and inappropriate divergence of interests that prohibited the zealous advocacy of the interests of the movant.[15]

The government's second contention is also flawed. As more fully developed *infra* section V., Officer Muzzatti did provide information that could be used to incriminate or potentially exculpate Mr. Harris. Although Officer Muzzatti may not be a witness for the prosecution in a new trial, he may be a defense witness. Moreover, whether Officer Muzzatti would be a witness in the government's hypothetical new trial does not alter the effects his testimony may have had at the 1991 trial.

## V. Adverse Effect

However, an actual conflict of interest is not enough for a presumption of prejudice. The second prong of this standard requires that the conflict have an adverse effect upon the attorney's performance. "To demonstrate adverse effect, a defendant must establish that an 'actual lapse in representation,' resulted from the conflict." *Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993) (quoting *Cuyler,* 446 U.S. at 336, 100 S.Ct. at 1711). This lapse in representation "adversely affecting the defendant's interests can be demonstrated not only by what the attorney does, but by what he refrains from doing." *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988), *cert. denied* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989) (citing *Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978)); *Gambino,* 864 F.2d at 1080 (Mansmann, J. dissenting) ("Conflict of interest cases tend therefore to have us inquire into sins of omission rather than sins of commission. The truth is that inaction is the essence of a conflict of interest problem born out in this case."); *United States v. Tatum,* 943 F.2d 370, 376 (4th Cir.1991) ("Rather, the failure to take actions that are clearly suggested from the circumstances can be as revealing.").

█ The First and Third Circuits have adopted a helpful test for *proving* adverse

---

relationship between two unmarried persons of the same sex (without legal recognition because of the legal prohibitions against homosexual marriage) could easily create an actual conflict of interest.

**14.** The circumstances surrounding this relationship are more apt to be in a made-for-television movie than a judicial opinion. At the same time that Ms. Hunter was representing Mr. Harris, Officer Muzzatti was embroiled in a bitter divorce proceeding. Movant suggests that this situation created an emotionally delicate atmosphere throughout Ms. Hunter's representation. This opinion will not delve into movant's allega-

tions regarding the effect of this divorce on Mr. Harris' representation or trial. Suffice it to say that Mrs. Muzzatti's role in bringing the Hunter/Muzzatti relationship to the attention of the court is notable.

**15.** The Comments to the District of Columbia Rules of Professional Conduct ("D.C. Rules") make clear that "a lawyer might not be able to represent a client vigorously if the client's adversary is a person with whom the lawyer has longstanding personal or social ties." D.C. Rules Cmts. ¶ 11.

effect on the basis of what an attorney failed to do:

> [A defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Gambino,* 864 F.2d at 1070 (quoting *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir. 1985) (citing *Brien v. United States,* 695 F.2d 10, 15 (1st Cir.1982)). Following this test, this court must determine whether any of the defense strategies Mr. Harris suggests his trial counsel failed to take were viable alternatives, and whether these alternatives were inherently in conflict with Ms. Hunter's other loyalties or interests.

The defense theory of the case at trial was to rebut the government's evidence that movant constructively possessed the drugs found in his basement by pointing the finger at visitor Derrick Johnson as the actual possessor of the drugs and characterize Mr. Harris as an innocent host victimized by his guest. To this end, the defense introduced a notarized statement from Johnson declaring that he had gone to defendant's home on a social visit, bringing with him drugs, whose existence was unknown to defendant or the other guests.[16] Defendant called a number of witnesses to corroborate Johnson's story.

Although Ms. Hunter did put on a plausible defense, this court believes that there was an alternative defense strategy that was not vigorously pursued because of trial counsel's relationship with Officer Muzzatti. Trial counsel could have focused her defense around the possibility that the police were completely mistaken about key facts surrounding the arrest of Mr. Harris. Such a defense argument is well-recognized as a powerful weapon in front of a jury and would have been perfectly suited for this case. Indeed, counsel for movant's codefendant used this tactic, and the jury hung on both counts against the codefendant.

The placement of Mr. Harris in the basement and his proximity to the drugs were crucial elements of the prosecution in this constructive possession case. Ms. Hunter knew that Officers Naugle and Bell had inconsistent testimony regarding exactly what went on in the house that evening, including Mr. Harris' location in the basement. Hunter Dep. at 208.

When Officer Muzzatti testified on direct examination that he was in the basement during the evening, Ms. Hunter was presented with the perfect opportunity to explore this conflicting information. However, Ms. Hunter's attempts at eliciting information for use in exploiting any theory on cross-examination were woefully inadequate. Rather than attempting to obtain information regarding what was going on in the basement, Ms. Hunter established a record that distanced Officer Muzzatti from her client and herself. *See supra* II.B.[17] Even after Offi-

---

16. The statement read, in part:

> At about 10:00 p.m. the cops showed up and I ran to the back of the basement. I then threw the drugs I had on me behind the refrigerator, then I walked back to the area where I was sitting at, and the police had arrived downstairs at this time.... After awhile, I was then taken upstairs by one of the officers, and at this time I told the officer that the drugs were mine.

Movant's Suppl.App., Tab 9.

17. Ms. Hunter's deposition testimony regarding her cross-examination underscores her potential for conflict of interest:

> Q. Were you surprised when Officer Muzzatti stated on direct examination by Mr. Mills that he was involved in the search?

> A. Yes, as I recall, I was.
> Q. Why were you surprised?
> A. Because he had told me that he didn't have anything to do with the search of the house.
> Q. Did you consider withdrawing at that point from representing Mr. Harris?
> A. *No, I waited until my cross-examination, where we clarified what he said.* At that point, it was clear that he had not participated in the search of the house.
> Q. Did you consider raising the issue with the court at that time?
> A. No....
> Q. What was your intention in asking him questions on cross-examination?
> A. *To clear up whether he was in the basement or not. Because if he had indeed had direct*

cer Muzzatti testified that he "saw the officers in there. They were doing their job, so I went back upstairs" on cross-examination by counsel for codefendant Odom, Ms. Hunter never broached the issue. Tr. I at 33. In fact, she didn't ask another question.

As the government points out, Officer Muzzatti was certainly not a central witness against Mr. Harris; however, he did offer evidence that was incriminating to Mr. Harris. For example, through Officer Muzzatti, the government was able to isolate Mr. Harris' presence inside the home to create the image of Mr. Harris on the first floor running down to the drugs.[18] But more importantly, he offered testimony ripe for cross-examination.

The government suggests that Ms. Hunter did as much as she could with this case. In fact, they state that she did a great deal more than most lawyers would be able to do because she was able to find a person who would claim actual possession and get the evidence of his actual possession into the case, and that was a trial tactic "tour de force." There is no question that these trial accomplishments were outstanding; however, none of these tactics required her to battle those with whom she had an actual conflict.

*involvement with the search involving Mr. Harris' case, then I would be back at square one and having to discuss with Mr. Harris what had just transpired.*

Hunter Dep. at 307. Rather than concentrating on pointing out inconsistencies in Officer Muzzatti's testimony or exploiting his hearing the door slam to create the impression in the minds of the jurors that others who possessed the drugs could have fled the home, Ms. Hunter was much more concerned with distancing Officer Muzzatti (and herself) from any events related to Mr. Harris. Thus, saving her from having to start at square one and discuss the true nature of her relationship with Officer Muzzatti with the movant.

18. In addition, Officer Muzzatti testified about trying a key to this basement door in the back. The government adduced considerable testimony that it was blocked. In fact, Officer Muzzatti testified that he tried the key and attempted to push open the door. He stated that the entry was impeded because of furniture on top. Eventually the key recovered from Mr. Odom opened the door. This testimony could have been used to discredit other government witnesses concerning the egress. Officer Delpo testified that the door wasn't blocked. However, there was no cross-examination to point out this discrepancy.

## VI. Waiver

■ Although a movant may waive his right to the effective assistance of counsel, courts "must indulge every reasonable presumption against the waiver of the unimpaired assistance of counsel." *United States v. Hurt,* 543 F.2d 162, 168 n. 34 (D.C.Cir. 1976) (citations omitted). Indeed, the waiver of one's Sixth Amendment rights is so suspect that trial courts may refuse a waiver and override a movant's choice of counsel.

■ Any valid waiver must be made voluntarily. It must constitute an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). No waiver may occur unless it is made with "sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). Thus, the degree of disclosure required to meet the valid waiver standard is exceptionally high. A criminal movant must be informed of "the precise manner in which he might be prejudiced by [the] representation." *United States v. White,* 706 F.2d 506, 508 (5th Cir.1983).[19]

19. The Local Rules of the United States District Court for the District of Columbia dictate that attorney conduct is governed by the rules adopted by the District of Columbia Court of Appeals. The District of Columbia Rules of Professional Conduct (D.C. Rules) became effective on January 1, 1991.

As D.C. Rule 1.7 states:
(c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if:
 (1) Each potentially affected client provides consent to such representation *after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation;* and
 (2) The lawyer is able to comply with all other applicable rules with respect to such representation.
*See* D.C. Rule 1.7 (emphasis added).
 The Comments to the D.C. Rules also mandate that "[d]isclosure and consent are not mere formalities." *Id.* cmt. ¶ 12. If an objective observer would have "any reasonable doubt" that the representation would not be zealous and wholehearted, then the "client has a right to disclosure of all relevant considerations and the opportunity to be the judge of [his] own interests." *Id.* In

At their first meeting, Ms. Hunter informed Mr. Harris that she "had a relationship with a Five D Officer and knew other Five D officers." Hunter Dep. at 90, 93, 110; Hunter Aff. at 3. She did not state any names or offer any other specific information bearing on the nature of her relationships with Fifth District vice officers. Hunter Dep. at 90, 109. She did not tell him that these officers were involved in the execution of the warrant leading to his arrest. *Id.* at 95.. She did not indicate that she was involved in an intimate relationship with a government witness testifying in his trial.[20] Given the information with which he was presented, Mr. Harris responded that Ms. Hunter's familiarity with Fifth District officers would not be a problem as long as she did her job. *Id.* at 87, 89–90. Ms. Hunter then assured Mr. Harris that she would use any information she received from the police to his benefit. *Id.* at 90.[21]

When Ms. Hunter spoke to Mr. Harris in her office a few days later, they talked about the relationship in more detail. *Id.* at 89. When Ms. Hunter explained that she would employ an investigator to assist her in this case, Mr. Harris asked if her "police officer friend" would be conducting the investigation. Ms. Hunter is certain that Mr. Muzzatti's name came up at some point during this conversation, but not "in what detail." *Id.* at

113–15. At some point during this conversation, she stated to Harris that Officer Muzzatti was her boyfriend. *Id.* at 116. Amid this confusion, Ms. Hunter doesn't recall if she told Mr. Harris that Officer Muzzatti was involved in the raid on 1239 Gallatin St. *Id.* at 141. She does recall "assur[ing] him that Officer Muzzatti would have no involvement in my case." *Id.* at 142–43. In the many subsequent meetings leading up to trial, Ms. Hunter never again spoke about her relationships with Fifth District officers in greater detail at any time before the jury reached a verdict. *Id.* at 150.[22] She mentioned nothing about the scope of the relationship. *Id.* at 95, 109.

Ms. Hunter and Mr. Harris did not further discuss the issue of her relationships with Fifth district vice officers in greater detail at any time before the jury verdict. In fact, Ms. Hunter *never* told Mr. Harris that she was involved in a longstanding sexual relationship with Officer Muzzatti. *Id.* at 96.

In this case, trial counsel failed to adequately disclose the nature and extent of her relationship with Officer Muzzatti. Ms. Hunter did not disclose sufficient information for Mr. Harris to appreciate the risks inherent in Ms. Hunter's representation. She never informed movant before trial that a police officer with whom she had an intimate relationship was involved in the raid leading

---

this regard, the Comments recommend "a written summary of the considerations disclosed" to the client when an issue of conflict exists. *Id.* cmt. ¶ 13.

Another useful commentary on professional conduct, the American Bar Association Standards for Criminal Justice, underscores the ethical commands of the D.C. Rules. The ABA Standards provide:

At the earliest feasible opportunity, defense counsel should disclose to the movant any interest in or connection with the case or any other matter that might be relevant to the movant's selection of a lawyer to represent him or her.

*See* ABA Standard 4–3.5(a).

Although neither the D.C. Rules nor the A.B.A. Standards provide a basis for a finding of conflict or adverse affect, they do provide a yardstick for adjudging the conduct of attorneys. This court finds that Ms. Hunter's conduct is violative of the principles set forth in the D.C. Rules.

20. Ms. Hunter's March 14, 1991 file notes confirm that her references to fifth District Officer,

during that initial meeting with Mr. Harris, were highly generalized:

Spoke with Mr. Glenn [Harris] about my close relationship w/5D Vice Ofcs. He said he had no problems w/it. Also told co[defendant]. Co[defendant] had no objection to my representing J. Glenn [Harris]. Told PDS that I knew 5D Vice.

Mot. Vacate, Set Aside, Correct Sentence, Tab 7.

21. The court cannot condone this kind of perversion of the justice system, whereby a defense attorney suggests to a defendant that any information she can solicit from police officers through personal relationships will only be used against the police to the defendant's advantage. Ms. Hunter's assurances to Mr. Harris may be viewed as an attempt to create the impression of inappropriate, inside influence, an effective tool in soliciting a waiver of any conflict of interest.

22. In fact, Ms. Hunter never felt uncomfortable about the fact that she never informed him of the full scope of her relationship with Muzzatti at the March 14 meeting. *Id.* at 108.

to movant's arrest. She also failed to discuss the possible adverse legal consequences of her representation with Mr. Harris. Hunter's testimony precludes a finding of waiver. There is no waiver based upon her imprecise, incomplete, out-of-court disclosures to Mr. Harris. To the contrary, Ms. Hunter's statements to movant that her relationships with police officers would only benefit him could only serve to induce him to trust her based upon her relationships, rather than question her loyalty because of those relationships.

■ Moreover, in the case of court-appointed counsel in a criminal case, a trial court should determine on the record whether a waiver is proper after a full inquiry. This requirement is consistent with the court's duty to explore conflict issues of which it knows or reasonably should know.[23] Therefore, the threshold requirement for a waiver is the trial court's awareness of the actual or potential conflict.

During this colloquy with the trial court, a movant should receive specific advice concerning the right to conflict-free representation. He should be instructed on the dangers arising from the particular conflict. The court should also determine "preferably by means of questions that are likely to be answered in narrative form, whether the movant understands the risks and freely chooses to run them." *United States v. Rodriguez*, 968 F.2d 130, 138–39 (2d Cir.1992). This procedure will also enable the government to meet its burden of proving waiver in any subsequent proceedings. *United States v. Allen*, 831 F.2d 1487, 1498 (9th Cir.1987) (citing *Barker v. Wingo*, 407 U.S. 514, 529, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972)).

Ms. Hunter never informed the court about the conflict issue at any time before the July 12, 1991 verdict.[24] As a result, this court was unaware of any potential or actual conflict of interest. Counsel has an ethical obligation "to avoid conflicting representations and to advise the court promptly when a conflict of interest arises...." *Cuyler*, 446 U.S. at 346–47, 100 S.Ct. at 1717. Because counsel is in the best position to determine when a conflict exists or will develop, "trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Id.* at 347, 100 S.Ct. at 1717 (citation omitted).

Even more startling is that fact that Assistant United States Attorney David Mills was apparently aware of the Hunter/Muzzatti relationship. Hunter Dep. at 340. Mr. Mills never alerted the court to his knowledge of this conflict of interest despite the government's duty to bring such issues to the court's attention and, if necessary, move for disqualification of counsel when a conflict of interest becomes apparent to the government. *United States v. Tatum*, 943 F.2d 370, 380 (4th Cir.1991); *see United States v. Fulton*, 5 F.3d 605, 612 (2d Cir.1993) ("[T]he ... district judge in this case was caught by surprise—a situation the government should have prevented by the simple expedient of informing the district judge of the allegations in advance of trial."); *United States v. Arrington*, 867 F.2d 122, 129 (2d Cir.1989) (district court refused waiver and disqualified attorney when government informed the court of an alleged plot to silence witnesses and the possible involvement of co-defendant's counsel).[25]

**23.** Therefore, once defense counsel becomes aware of a potential conflict, she must inform the court so that it may exercise its supervisory powers to ensure a fair trial. *See United States v. Allen*, 831 F.2d 1487, 1497 (9th Cir.1987) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980)).

**24.** This court finds it disturbing that Mr. Hunter was never concerned during her period of representation that she did not disclose the nature of her relationship to the court. Hunter Dep. at 171. Ms. Hunter felt no obligation to disclose it to the court. *Id.* at 174.

**25.** In fact, Ms. Hunter claims that Mr. Michael C. Wallace, Jr., of the Federal Public Defender's Office, defense counsel for codefendant Odom, also knew about the relationship between Muzzatti and her. Hunter Dep. at 99. She states that she told Mr. Wallace of her "intimate relationship with one of the police officers" before the conclusion of the government's case. *Id.* at 100, 326. If so, everyone except the court and the movant knew of the intimate relationship. Mr. Wallace disputes this assertion. Wallace Aff., Movant's Reply Mem.Suppl.App.Tab. 3, ¶ 5.

 Upon receipt of Ms. Odom's letter, Ms. Hunter asked Mr. Harris if he wanted "to do something about it." Hunter Dep. at 156. Ms. Hunter states that she informed Mr. Harris that he could get a new lawyer. *Id.* Mr. Harris declined. Regardless of Ms. Hunter's disclosure at that time, it would be too little, too late. Similarly, the discussion on the record at the October 8, 1991 presentencing hearing could not constitute a waiver of any rights by movant. In any case, a waiver of Sixth Amendment rights to effective assistance of counsel cannot be made retroactively.

## VII. Appearance of Impropriety

 The appearance of impropriety looms ominously over the facts of this case. Unbeknownst to the court, defense counsel was having an adulterous affair with a lead government witness. A product of the evidence gathered in the course of the bitter, Muzzatti divorce proceedings, Ms. Hunter and Officer Muzzatti are witnessed leaving Ms. Hunter's home together at 6:45 p.m. on July 12, 1991; the jury verdict was entered at 5:42 p.m. that day against Mr. Harris. Between the July 12, 1991 verdict and October 8, 1991 sentencing, Ms. Hunter and Officer Muzzatti vacationed in the Bahamas together, along with other officers who testified against Mr. Harris in the trial. Ms. Hunter and Muzzatti attended Officer Naugle's wedding reception while Mr. Harris' case was pending. Hunter Dep. at 38. And Ms. Hunter admittedly gets information from many Fifth District police officers because of her relationship with Officer Muzzatti.

Ms. Hunter is a veteran D.C. defense lawyer and former president of the Superior Court Trial Lawyers Association. She stated that she spoke informally with D.C. Bar Counsel before she began her relationship with Officer Muzzatti. Hunter Dep. at 78, 245–46; Hunter Aff. at 2. She was advised that "if [Officer Muzzatti was] directly involved in the case, then you shouldn't represent the person." Hunter Dep. at 79. Ms. Hunter understood this to mean that Ms. Hunter could represent any defendant unless

Officer Muzzatti "would be testifying against the defendant." *Id.* at 79. She defined direct involvement to something akin to recovery of drugs, handcuffing the defendant, or arresting the defendant. *Id.* at 81. It is distressing that she did not consider Officer Muzzatti's involvement in this case to be direct, *id.* at 84, and still contends that "[her] client's adversary was not Officer Muzzatti...." *Id.* at 253.

Comment Seven of the D.C. Rules states:
[I]f an objective observer would have any reasonable doubt on [the] issue [of whole hearted and zealous representation], the client has a right to disclosure of all relevant considerations and * * * to be * * * judge of its own interests.

D.C. Rules cmt. 7. This court finds it difficult to believe that any objective observer of this situation would believe that Ms. Hunter could give her whole hearted and zealous representation despite her current relationship.

Trying to refute any argument about Ms. Hunter trying to keep this case in the face of a conflict for financial reasons,[26] the government points out that Ms. Hunter is a successful lawyer, and one criminal drug case in federal court is not going to make or break her practice. This is true. Therefore, the court wonders why Ms. Hunter would put herself in the position of cross-examining her lover on the witness stand in this case.

## VIII. Conclusion

 The standards governing conflicts of interest in this jurisdiction are contained in the District of Columbia Rules of Professional Conduct. D.C. Rule 1.7 states that

(b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:

 * * * * * *

(4) The lawyer's professional judgment on behalf of the client ... reasonably may be adversely affected by the lawyer's ... interests in a third party or the lawyer's own ... personal interests.

---

26. Court-appointed attorneys are paid more for federal appointments than for D.C. Superior Court appointments. The majority of Ms. Hunter's appointments are in D.C. Superior Court.

Ms. Hunter should have known this case would be problematic the moment she learned that her lover was involved in any way. Ms. Hunter should not have represented Mr. Harris in this case.

As Justice Storey stated:

An attorney is bound to disclose to his client every adverse retainer, and even every prior retainer, which may affect the discretion of the latter. No man can be supposed to be indifferent to the knowledge of facts, which work directly on his interests, or bear on the freedom of his choice of counsel. When a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has not interest, which may betray his judgment, or endanger his fidelity.

*Williams v. Reed*, 3 Mason 405, 418, Fed. Case No. 17,733 (C.C. Maine 1824).

Having identified conflicts so potentially multifaceted as Ms. Hunter's, this court is struck by the gross insensitivity of Ms. Hunter to her ethical responsibilities. This court finds that Ms. Hunter represented Mr. Harris while acting under an actual conflict of interest that adversely affected her representation, thus violating her fundamental duty of loyalty to Mr. Harris.

This court finds that there has been such a denial of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack. Therefore, this court will vacate and set aside the judgment and grant a new trial.[27] It is essential that the public be able to place absolute confidence in the integrity of the criminal justice system; to rule otherwise today would "shock the public's collective notion of justice."

The clerk of court shall transmit a copy of this opinion FORTHWITH to the Committee on Grievances for review of the conduct of Ms. Hunter, to the Counsel for Professional Responsibility in the Office of the Attorney General of the United States for review of the conduct of the United States Attorney's Office, and to the General Counsel of the Metropolitan Police Department for review by the Chief of Police of the behavior of the police officers involved in this case.

A separate order shall issue this date.

## ORDER

This case now comes before this court on defendant Harris' motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. On March 12, 1993, this court sealed all future filings and proceedings in this matter pending further order of this court. For the reasons set forth in the accompanying memorandum opinion, it is hereby ORDERED:

1. The March 12, 1993 sealing order is VACATED.

2. Defendant Harris' sentence is VACATED and a new trial is GRANTED.

3. Movant's motion concerning potential scheduling issues that may arise on or after August 23, 1993 is DENIED as moot.

4. The government's motion to modify the temporary sealing order and to enter a permanent order is DENIED by the unsealing of the record.

5. The remainder of movant's motion to conduct discovery and supplemental motion to conduct discovery are DENIED as moot in light of the court's disposition.

6. The movant's motion for an evidentiary hearing is DENIED as unnecessary in light of the court's disposition.

SO ORDERED.

---

27. "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255.