**Adrian C. WILLIAMS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–980.**

District of Columbia Court of Appeals.

Argued Nov. 13, 1987.
Decided Oct. 25, 1988.

---

**4.** Pub.L. 93–198, Dec. 24, 1973, 87 State. 774, 1    D.C.Code 175–247 (1981).

the time the brief was filed, and Michael W. Farrell and Helen M. Bollwerk, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

Appellant was charged with several offenses stemming from three different break-ins at an American University dormitory. A jury found him guilty on two counts of unlawful entry [1] and one count of first-degree burglary.[2] Appellant contends that the trial court erred in allowing the government to introduce evidence of certain other crimes for which he was not on trial, contrary to the teaching of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and its myriad progeny. He also maintains that his burglary conviction should be reversed on the ground that the evidence was insufficient to prove that he had a specific intent to steal. We reject the second argument. As to the first, we hold that even if the challenged evidence was admissible (an issue which we do not decide), the government made improper use of it in the presentation of its case. Accordingly, we reverse all of appellant's convictions and remand this case for a new trial.

I

The first break-in occurred during the afternoon of March 17, 1983. Julie Goetz, an American University student, returned to her room in Anderson Hall to discover that her door, which she had locked, was open. She walked in and found appellant standing inside her room. When she asked what he was doing there, appellant replied that he was an electrician sent by the front desk to repair a short circuit. When Goetz called the front desk to confirm his story, however, she was told that no electrician had been sent.[3] Goetz then asked appel-

Thomas K. Clancy, Washington, D.C., appointed by this court, for appellant.

Jody Goodman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at

1. D.C.Code § 22–3102 (1981).

2. D.C.Code § 22–1801(a) (1981).

3. At that time, Kolb Electric Company had an exclusive contract with American University for electrical work. Appellant has never worked for Kolb Electric Company.

lant if he belonged in Letts Hall, an adjoining dormitory which had recently experienced power failures. Appellant said "Oh, yeah, that's probably it," and left. About two hours later Tracy Buell, one of Goetz's roommates, returned to the room and found that her jewelry box was open and that several pieces of jewelry were missing.

The second incident occurred six days later, on March 23, shortly after 8:00 a.m. Anne Jensen was leaving her room (number 607) in Anderson Hall when she saw appellant come out of room 608. They walked to the elevator together, and appellant said something to suggest that he had spent the night with someone in room 608.[4] Appellant got off the elevator at the second floor, and Jensen continued down to the first, where she promptly asked the receptionist at the front desk to notify security. The receptionist did so and also called room 608, where Stephanie Winshel had been asleep. Winshel, alone in the room at the time, had not seen appellant, much less permitted him to enter her room.

Appellant was again found in room 608 on March 29. At about 8:00 a.m. on that date, Lisa Balaban, one of Stephanie Winshel's roommates, was getting ready to leave when she noticed appellant standing in her room. Appellant explained that he was an electrician and had come to repair a short circuit. When Balaban told him that her room did not have any electrical problems, appellant said, "Oh, wrong room," and left.

As a result of these three incidents, American University beefed up its security force. Joseph Twiggs, a campus security officer, was assigned to the Letts–Anderson dormitories to determine whether the reported intruder was in fact a stranger or a university employee. Shortly after 10:00 a.m. on April 5, Twiggs caught sight of appellant approaching the dormitory complex. He watched as appellant entered Anderson Hall through a fire door and headed toward a stairway that gave him access to all floors. Officer Twiggs and a partner, William Peacock, began to canvass the building and eventually found appellant on the fifth floor. Appellant had no identification, refused to give his name, and said he was there looking for a job. Twiggs and Peacock escorted him back to the security office, where he said his name was Andre McDonald.

Appellant was then taken to a police station and placed under arrest for unlawful entry. Detective Thomas Selby of the Metropolitan Police, after obtaining photographic identifications from Anne Jensen and Lisa Balaban, interviewed appellant at the station. Upon being advised of his *Miranda*[5] rights and signing a written waiver, appellant admitted that he was responsible for the burglary "where I told the girl I was an electrician." When asked what he had done with the jewelry, appellant replied that he had "sold it on the street." Selby assumed that these admissions referred to the March 17 incident, since it involved the theft of some jewelry.

Appellant, testifying on his own behalf, admitted that he had entered the dormitory rooms on the three occasions in March. His defense, however, was that he had done so as part of his undercover "investigative work for the Metropolitan Multi–Offender Unit." As part of his "investigation" at American University, appellant said, he entered student rooms to "see whether or not there was anything going on." Appellant also stated that even though he had some "conversations" with campus security, he did not reveal his undercover status to the security officers. Instead, he claimed that he was an electrician, an identity that the police had told him to use. Appellant's alleged undercover work continued through April 1983.

On cross-examination appellant admitted that he had been arrested on January 7, 1983, for an "incident." The charges based on that incident were dropped, however,

---

4. This comment aroused Jensen's suspicions because she "didn't think that any of the girls in that room would have such a person stay overnight."

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

when appellant agreed to cooperate in an investigation with Metropolitan Police Officer Joseph Newman and Sergeant Stanley Hawkins on ˙April 5. Appellant also acknowledged that he was again arrested on April 29, 1983, after being found in a stairwell at Georgetown University in the "real early morning," sometime between 4:30 and 6:00 a.m. He told the Georgetown security officers that he was working for Sergeant Hawkins. Hawkins was contacted, but apparently to no avail; appellant was charged later that day with unlawful entry.

The government called Officer Newman, Sergeant Hawkins, and Detective Peter Bignotti as rebuttal witnesses. All three testified that they first met appellant at the Second District police station on April 5, after he had been placed under arrest for unlawful entry that day at American University. Bignotti asked if appellant knew the location of Dwight Foster, a murder suspect wanted by the police. Appellant replied that he did and agreed to help the police as long as he received some kind of benefit.

The police arranged for appellant to be released on a citation for the April 5 offense,[6] even though he was not eligible for such treatment, and in exchange he agreed to give them information on Foster's whereabouts. Appellant was provided with an identifying code number as well as the telephone numbers of a confidential police line and Sergeant Hawkins' home. The police instructed appellant to work only as a "telephone informant," calling in whenever he had something to report. He was never asked to do "undercover" work at any college or university; on the contrary, he was specifically told, at a meeting on April 15, to stay away from college campuses. Nor was he ever authorized to engage in any illegal conduct. Appellant failed to provide the police with any useful information on Dwight Foster or any other

suspect; instead, Officer Newman testified, he sent them "on wild goose chases from one end of the city to the other." His role as a telephone informant ended on April 25, 1983.

The jury found appellant guilty of first-degree burglary for the March 23 incident, and guilty of unlawful entry for the March 17 and March 29 incidents. It acquitted him of the theft of Tracy Buell's jewelry on March 17, with which he was also charged.

## II

Appellant contends that the trial court erroneously allowed the jury to learn of four crimes other than the ones with which he was charged, in violation of the principles set forth in *Drew v. United States,* *supra,* and the long line of cases following *Drew.* He claims that the court should not have admitted evidence of (1) his arrest for unlawful entry at American University on April 5, 1983; (2) his arrest for unlawful entry at Georgetown University on April 29, 1983;[7] (3) his arrest on January 7, 1983, for an unspecified offense;[8] and (4) another arrest in May 1983, also for an unspecified offense, which Sergeant Hawkins mentioned briefly, without explanation, in the course of his testimony. The record makes clear that the May arrest was on a warrant for the March 17 burglary of Julie Goetz and Tracy Buell's dormitory room. As to the other three incidents, however, even assuming that they were admissible for a limited purpose, we agree with appellant that the use which the government made of one of them unduly prejudiced his case and requires reversal of his convictions.

It is a settled rule in this jurisdiction, beyond all dispute, that evidence of other crimes wholly independent of those charged is generally inadmissible unless its admission can be justified under a recognized exception to the rule. *E.g., Campbell v. United States,* 450 A.2d 428, 430

6. Eventually the January 7 and April 5 charges were both dismissed.

7. Testifying about this incident, Officer Newman stated that appellant had been arrested on April 29 for "another campus burglary."

8. At a bench conference, out of the hearing of the jury, the prosecutor told the court that this arrest had been for attempted burglary.

(D.C.1982); *Light v. United States,* 360 A.2d 479, 480 (D.C.1976). The leading case in the District of Columbia is *Drew v. United States, supra,* in which the court listed five such exceptions. Under *Drew,* other-crimes evidence "is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." 118 U.S.App.D.C. at 16, 331 F.2d at 90 (footnote omitted). These so-called *"Drew* exceptions" did not originate in the *Drew* case but are of long standing in our jurisprudence. They can be traced directly back to *People v. Molineux,* 168 N.Y. 264, 291–294, 61 N.E. 286, 294 (1901), and have been embedded in the law of the District of Columbia since 1906. *Burge v. United States,* 26 App.D.C. 524, 536 (1906) (citing *Molineux*). The *Drew* court and other courts have recognized that there are additional exceptions to the rule against admissibility of other-crime evidence. "[T]his list is not necessarily all-inclusive. These are, however, the major exceptions." *Drew, supra,* 118 U.S.App.D.C. at 16 n. 10, 331 F.2d at 90 n. 10 (citation omitted).

With these general principles in mind, we turn to the specific evidence of which appellant complains.[9]

### A. *The April 5 Incident*

■ The government argues first of all that proof of the April 5 incident was not barred by *Drew* because it did not involve any criminal behavior on appellant's part. It relies on several cases in which we have held that *Drew* does not apply to evidence of conduct which, though strange or suspicious, is not "minimally in the nature of a criminal offense." *Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983); *accord, e.g., Bigelow v. United States,* 498 A.2d 210, 212 (D.C.1985); *Hawkins v. United States,* 482 A.2d 1230, 1232 (D.C.1984);

*Jones v. United States,* 477 A.2d 231, 237–238 (D.C.1984). The government is correct in its analysis of these cases, but they plainly do not apply here. Not only did Officer Twiggs describe in meticulous detail appellant's surreptitious entry through a fire door into Anderson Hall on April 5, but Detective Selby testified that he went to American University that day to investigate "an unlawful entry" (a term repeated by the prosecutor in her next question) and that appellant was "under arrest" when Selby interviewed him later that day at the police station. The prosecutor made clear, in her questions to Detective Selby, that the arrest was not for either the March 23 or the March 29 incident. Detective Bignotti testified that when he first saw appellant on April 5 at the Second District police station, "it was obvious" that he was under arrest. Officer Newman stated that when he saw appellant on the same occasion, "he had already been arrested, I believe, for unlawful entry in one of the college campuses." Sergeant Hawkins said that when Detective Bignotti called him from the Second District on April 5, "he said he had a subject in custody who claimed to know where [Dwight] Foster was." On this record, and given the court's later instruction on unlawful entry as a lesser included offense of burglary, a reasonable juror would readily conclude that appellant's activities on April 5 amounted to an unlawful entry—a crime—for which he was arrested. Thus the government's reliance on the *Wheeler* line of cases is misplaced.

■ We also reject the government's argument that the April 5 incident was admissible under *Toliver v. United States,* 468 A.2d 958 (D.C.1983), and *Green v. United States,* 440 A.2d 1005 (D.C.1982); *see also Fairbanks v. United States,* 96 U.S.App.D.C. 345, 347, 226 F.2d 251, 253 (1955). Those cases hold that other-crimes evidence may be admissible "to explain the immediate circumstances surrounding the offense charged." *Toliver, supra,* 468 A.2d at 960 (citations omitted). "Immediate circumstances" in this context are

---

**9.** This case does not present any issue with respect to the timing of the other-crimes evidence, *i.e.,* whether the evidence may be introduced during the government's case in chief or only in rebuttal. *See Thompson v. United States,* 546 A.2d 414, 423–424 (D.C.1988).

events so closely related to the charged offense in time and place that they are "necessary to complete the story of the crime on trial." *Campbell v. United States, supra,* 450 A.2d at 430–431 n. 4; *accord,* E. CLEARY, MCCORMICK ON EVIDENCE § 190, at 558 (3d ed. 1984) (evidence admissible if it "complete[s] the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings" (footnote omitted)). While it is true that the April 5 incident occurred in the same dormitory as the earlier incidents, it was not "nearly contemporaneous" or so closely related in time to any of the charged offenses as to be admissible under *Toliver* and *Green.* The government misreads *Campbell* in arguing otherwise.[10]

■ At trial the government did not argue that evidence of what happened on April 5 was admissible under any of the five *Drew* exceptions to the rule against admissibility. On appeal, however, it suggests that such evidence was probative of appellant's intent on the three dates in March when he was found inside students' rooms.[11] We cannot accept this suggestion. Allowing the government to use the April 5 incident, which (as far as the evidence showed) involved only an unlawful entry, to establish appellant's intent to steal in March would blur the line between unlawful entry and burglary. Unlawful entry does not require an intent to commit a particular crime; indeed, it is the absence of that very intent which principally distinguishes unlawful entry from burglary. *See Shelton v. United States,* 505 A.2d

767, 769 (D.C.1986). The fact that appellant entered the dormitory on April 5 without permission to do so cannot be relied upon to prove his specific intent to steal on three prior occasions. To hold otherwise would "obliterate the clear distinction the legislature has drawn between burglary ... and unlawful entry...." *Id.* at 770.

■ But this is not quite the end of our inquiry. As we have said, *Drew's* list of five exceptions is not exhaustive. The government argues that the April 5 incident was admissible, independently of *Drew,* to demonstrate appellant's familiarity with the dormitories and his knowledge of how to gain access to them. This was the main ground on which the government relied at trial in urging admissibility. We need not decide whether this argument is correct, either as a general proposition[12] or on the facts of this case, because the government did not confine its use of the April 5 incident to the purpose for which it was offered, *i.e.,* to prove appellant's knowledge. About halfway through her closing argument, the prosecutor[13] said that appellant "has admitted he's the guy. Not only was he there on three occasions, but, indeed, he was stopped at American University on April the 5th, 1983." A few moments later, commenting on appellant's credibility, the prosecutor noted that appellant "was locked up on April the 5th, caught red-handed in an American University dorm." Defense counsel objected to this argument, saying that "the way it came out, it sounded as if she was speaking

---

**10.** Moreover, even under *Toliver* and *Green,* "surrounding circumstances" evidence is admissible only if its probative value outweighs its prejudicial effect. *Tabron v. United States,* 410 A.2d 209, 214 (D.C.1979) (citing cases).

**11.** In its brief the government states that although "the prosecutor did not offer the evidence of the April 5 incident to prove intent ... [it] became probative of his intent once appellant testified that he was innocently present in the dormitory on the charged occasions."

**12.** *See United States v. Witschner,* 624 F.2d 840, 843 (8th Cir.) (evidence of similar criminal acts admissible in mail fraud trial to show defendant's "knowing participation in the scheme"), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66

L.Ed.2d 291 (1980); *United States v. De Fillipo,* 590 F.2d 1228, 1240 (2d Cir.) (evidence of prior conviction of possession of stolen goods admissible in trial for same offense to prove defendant's knowledge that goods were stolen), *cert. denied,* 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); *United States v. Madrid,* 510 F.2d 554, 555–556 (5th Cir.) (in trial for transportation of illegal aliens, evidence of similar act three months before charged offense admissible to prove knowledge that aliens were illegal), *modified on other grounds,* 517 F.2d 937 (1975); Fed.R.Evid. 404(b) (listing "knowledge" as one of eight grounds for admission of other-crimes evidence).

**13.** The government is represented by different counsel on appeal.

of his criminal propensity," but the court overruled the objection. Later, in her rebuttal summation, the prosecutor said:

> Well, folks, maybe he fooled the police in April of 1983, but I ask you not to let him fool you here. I ask you to look at the evidence in this case, evaluate the testimony that you heard in here, consider who has a reason to make up something. And I submit to you that you will then conclude that *Mr. Williams had no business being in an [American University] dorm on April the 5th even. Something he's not even on trial for. That case was dropped.* [Emphasis added.]

Defense counsel's objection to these remarks, on the ground that the prosecutor was arguing a "criminal propensity" on the basis of the April 5 episode, was overruled.

We think defense counsel's objection was well founded and should have been sustained. When the April 5 incident first came up early in the trial, the prosecutor argued that it was admissible to show that appellant knew the layout of the buildings and how to enter them through the fire door. In her summation to the jury, however, the prosecutor never mentioned this at all. Instead, she stressed that appellant "admitted he's the guy" who was found in dormitory rooms on three occasions in March and that he was "caught red-handed in [the same] dorm" on April 5. The clear implication of her argument was that even though the charges based on the latter incident had been dropped (because he tricked the police into believing he could help with their investigation of Dwight Foster), his presence in the dorm on April 5 showed that he must have been guilty of the crimes alleged to have taken place in the same dorm on the three dates in March

—precisely the sort of inference which the rule against other-crimes evidence is designed to prevent. *See Ali v. United States,* 520 A.2d 306, 310 n. 3 (D.C.1987). In short, the prosecutor made too much of the April 5 incident, going far beyond the limited purpose for which it had been offered. The court's failure to intervene at this point and repair the damage resulted in undue prejudice to the defense.[14]

### B. *The January 27 and April 29 Incidents*

■ Appellant testified on direct examination that he became a police informant in March 1983 partly because of "pending matters that I had" at the time. On cross-examination the prosecutor sought to clarify the exact nature of the relationship between appellant and the police. She asked appellant whether, at the time of his arrest in April, there was "another criminal charge pending" against him because of an incident on January 7 (see note 8, *supra*), and he acknowledged that there was such a charge. She also asked about his arrest at Georgetown University on April 29, when he told the campus security officers that he was working under cover as an informant for Sergeant Hawkins (which Hawkins denied when the Georgetown officers called him).[15] The testimony about the January 7 incident was very brief and was unchallenged by defense counsel. As to the April 29 arrest, counsel objected to the prosecutor's going into "every little detail about that particular matter," but the court ruled that the nature of appellant's defense made such questioning appropriate, and that he could be cross-examined "as to all of the circumstances where he has made assertions akin to the one he is making here." The government argues that this ruling

---

**14.** The prejudice was compounded by the trial court's failure to instruct the jury at any time concerning the limited purpose for which evidence of the April 5 incident was introduced. This court has "generally ... required the trial court, sua sponte if necessary, to instruct the jury as to the limited purpose for which [other-crimes] evidence is admitted and for which it is to be considered." *Sweet v. United States,* 449 A.2d 315, 319 (D.C.1982) (citations omitted). Although our case law makes clear that the omission of such an instruction "does not necessarily

constitute reversible error," *Jones v. United States, supra,* 477 A.2d at 242 (citations omitted), a proper instruction in this case might have gone far toward alleviating the prejudice.

**15.** Hawkins testified in rebuttal that appellant's relationship with the police had been terminated on April 25, and that he had told appellant on that date "that we could no longer try to work with him as an informant because he never gave us any useful information...."

was correct, asserting that appellant put his intent at issue by claiming to have been working for the police at the time of these incidents and thus paved the way for the prosecutor's presentation of this evidence through cross-examination and rebuttal.

We agree with the government that the court's ruling was correct. "The prosecutor's questions on cross-examination and the government's subsequent rebuttal evidence comprised legitimate exploration of two issues that appellant himself had raised:" the nature and duration of his association with the police as an informant. *Jones v. United States*, 548 A.2d 35, 39 (D.C.1988); *see Morris v. United States*, 389 A.2d 1346, 1352 (D.C.1978) ("the trial court should permit exploration of any matters which tend to contradict, modify, or explain the testimony given by a witness during direct examination" (citations and footnote omitted)). Having testified on direct examination that he had a relationship with the police, appellant could not bar the prosecutor from exploring the nature of that relationship, and in particular the date on which it ended (*viz.*, four days before appellant was arrested between 4:30 and 6:00 a.m. in a dormitory at Georgetown University).

But that is not the end of the matter. We must still consider whether the probative value of this evidence outweighed its obvious prejudice to appellant; more importantly, the trial court should have made that determination at the time the evidence was offered. *See Bigelow v. United States, supra*, 498 A.2d at 214; *Campbell v. United States, supra*, 450 A.2d at 430; *Rindgo v. United States*, 411 A.2d 373, 376 (D.C.1980); *Light v. United States, supra*, 360 A.2d at 480. Since we are reversing appellant's conviction because of the government's misuse of the April 5 incident, we need not decide whether the trial court's failure to engage in the probative/prejudicial balancing process, standing alone, would warrant reversal. On retrial, however, if the matter comes up again, the court should do so and place its reasoning on the record.

### III

■ Specific intent in a burglary case, unless admitted by the defendant, must usually be proved by circumstantial evidence or by some statement the defendant makes at the time of the burglary. *See Shelton v. United States, supra*, 505 A.2d at 770; *Massey v. United States*, 320 A.2d 296, 299 (D.C.1974). Appellant contends that the evidence failed to prove he had a specific intent to steal when he entered the room of Stephanie Winshel on March 23. We hold to the contrary that the evidence in this case, viewed as a whole, was sufficient to permit a reasonable trier of fact to find such an intent.

In particular, the jury was free to draw reasonable inferences from the events of March 17 in determining appellant's intent on March 23.[16] Appellant admitted to Detective Selby that on the occasion when he "told the girl [he] was an electrician" (which the jury could have found was March 17), he had "sold [the jewelry] on the street." Other evidence established that Tracy Buell's jewelry, which had previously been in her jewelry box, was found to be missing only two hours after appellant had entered the room which she shared with Julie Goetz. From this evidence the jury could reasonably infer (1) that appellant stole Buell's jewelry on March 17 and (2) that he returned to the same dormitory on March 23 and entered another room on the same floor intending to steal something of value there. *See Wheeler v. United States, supra*, 470 A.2d at 765 n. 9 (evidence of theft during first burglary admissible to prove intent to steal in second burglary). The fact that the jury acquitted appellant of the theft on March 17 is irrelevant. *See United States v. Powell*, 469 U.S. 57, 64–65, 105 S.Ct. 471, 476–477, 83 L.Ed.2d 461 (1984); *Steadman v. United States*, 358 A.2d 329, 332 (D.C.1976).

---

16. Appellant does not argue that the offenses of March 17 and March 23 were improperly joined in the indictment, nor could he make such an argument in light of Super.Ct.Crim.R. 8(a), which permits the joinder of offenses "of the same or similar character" alleged to have been committed by a single defendant.

## IV

For the reasons set forth in part II–A of this opinion, the judgment of conviction is reversed. This case is remanded for a new trial or for such other proceedings as may be appropriate.

REVERSED AND REMANDED.