**Jermaine C. THOMAS, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 92–CF–1349, 95–CO–1577.

District of Columbia Court of Appeals.

Argued Oct. 17, 1996.

Decided Nov. 14, 1996.

Peter H. Meyers, Washington, DC, appointed by this court, for appellant.

John Moustakas, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, and Thomas C. Black, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before SCHWELB, FARRELL and REID, Associate Judges.

Opinion for the court by Associate Judge REID.

Concurring Opinion by Associate Judge FARRELL at 752.

REID, Associate Judge.

Appellant Jermaine C. Thomas was convicted of first degree murder—premeditated, in violation of D.C.Code §§ 22–2401, –3202 (1996 Repl.); carrying a pistol without a license, in violation of D.C.Code § 22–3204(a) (1996 Repl.); and possession of a firearm during a crime of violence, in violation of D.C.Code § 22–3204(b) (1996 Repl.).[1] He filed a timely appeal challenging his conviction on the ground that the trial court erred in admitting testimony connecting him to a 9mm gun and a .45 caliber pistol. We find no error in the trial court's disposition of these evidentiary issues. Thomas also filed a motion under D.C.Code § 23–110 (1996 Repl.), attacking his conviction on the basis of ineffective assistance of counsel due to his trial counsel's alleged conflict of interest. He contends that the trial court abused its discretion in failing to hold a hearing on his motion. We agree.

## FACTUAL SUMMARY

On January 25, 1992, Joseph Young, Jr., age 16, was shot to death with a .45 caliber pistol. The murder took place in an alley

---

1. He was sentenced to twenty years to life on the murder conviction; one year for carrying a pistol without a license; and five to fifteen years for the possession of a firearm during a crime of violence. The sentences run consecutively.

which ran behind Thomas' girlfriend's home in the 600 block of 18th Street, N.E. Thomas' girlfriend, Alicia Edwards, and their infant child, lived with her mother, Patsy Edwards. Thomas stayed with the two women and the child periodically in the month prior to the murder.

In late December 1991 or January 1992, Patsy Edwards discovered that Thomas kept a gun in her home. She first saw the gun when her brother picked it up from the end of her living room sofa. She ordered Thomas to take it out of her house. However, one or two days later, while she was changing the bedsheets in her room, she found the gun under the mattress of her bed. Again she ordered Thomas to remove the gun from the house. When she checked the mattress later, the gun was no longer there. Patsy Edwards concluded that the gun she had seen was a .45 caliber pistol because she found two bullets in the drawer by her bed; on the bullets was the number .45. Adrienne Nedd, a close friend of Thomas' said that Thomas repeatedly talked about a .45 caliber gun during the week before the murder. When Thomas used the telephone in Nedd's room at the Budget Motel to call one of his girlfriends, Nedd overheard him say, "the .45 is the only one I got left."

On the day of Young's murder, Thomas, Young, Alicia Edwards and a young man named Antonious "Tony" Strong were together in a white Audi automobile. Thomas and Young heatedly argued over money and Thomas swung at Young. When the car reached the alley behind the 600 block of 18th Street, N.E., Thomas and Alicia Edwards got out and went into Edwards' home. While Edwards was upstairs, Thomas left the house. Edwards heard Thomas leave through the back door, came down the stairs, locked the back door and left the house through the front door.

As she was walking away from her home, Alicia Edwards heard gunshots. At least three other residents of the 600 block of 18th Street, N.E. also heard the gunshots. John Robinson, who was in the kitchen of his home, heard five to seven gunshots and "hit the deck." He got up, looked out of his window and saw a white foreign car leaving the area where Young was shot repeatedly. He told his son to call 911, ran to the alley and saw "a young man laying down." Malcolm Hilliard was at home when his wife shouted from the kitchen, "they are going to kill him, they are going to kill him." Hilliard rushed to a back window in his home, heard three or four shots, saw one young man chasing another and shooting at him. The shooter fired two or three more shots after the person he was pursuing fell to the ground. Hilliard heard the shooter say to another young man, "[d]on't run, don't run, Tony." Hilliard recognized the young man who fired the shots, and identified Thomas in court as the shooter.[2] When Hilliard's son could not get through to 911, Hilliard called a police detective, Walter Ellerbee, whose son is married to his (Hilliard's) daughter.

Chandria Perry was in the rear of her house when she saw Thomas shoot Young. She recognized him as a frequent visitor to Alicia Edwards' home; Perry made an in-court identification of Thomas.[3] Perry also saw a white car in the alley near the place where she saw Thomas standing and shooting Young. According to Kimberly Kelly, a friend of Thomas', Thomas confessed to her on January 25, 1992, that he had "just killed somebody" because he "owed [him] a lot of

2. Hilliard had seen Thomas in the neighborhood two or three times before, and Patsy Edwards had introduced him to Thomas three days before Young's murder. In addition, Hilliard had a conversation with Thomas about the starter in a white Audi 4000. When he gave his initial formal statement to the police, Hilliard did not identify Thomas as the shooter. However he had an "off the record" conversation with Detective Ellerbee on January 25, the day of the murder during which he told the detective that Thomas

had done the shooting. Hilliard explained that he did not want to become involved and be regarded as a snitch, and that he had two teenage sons of his own. After talking with his teenage sons, Hilliard decided to make a formal statement as to what he had seen.

3. Perry did not identify Thomas during a February 10, 1992, lineup. She explained that "[her] mother had told [her] earlier not to get involved with the situation."

money." [4]   While Kelly conversed with Thomas on that occasion, Strong arrived, and Thomas told him, "I shot him in the head, man, I shot him in the head.... Man, I know they are going to get me ... because ... that old lady ... [was there]."

The alleged motive for the murder was Young's failure to return a 9mm gun to Thomas as well as money that Young apparently owed Thomas.   Thomas persistently tried to get his 9mm gun from Young. Thomas told Young's sister, Angela Peterson, and his close friend Adrienne Nedd, that he gave a 9mm gun to Young.[5]   Two other persons, friends of Thomas, confirmed Thomas' dispute with Young regarding the missing gun.   Yet another friend, Charlotte Robinson, overheard a twenty minute heated argument involving Young, Thomas and another of Thomas' girlfriends, Lisa Jackson.   Robinson asserted that Thomas talked about a gun and money, and told Young that "he better get what belongs to [Thomas]."   She also recalled that Young yelled to Thomas at one point to "get off of me."   In a videotaped statement to the police, Thomas admitted having given a 9mm gun to Young.

On the day of the murder, Strong, Thomas, Young and Paula Mayo, one of Alicia Edwards' friends were in the white Audi. Mayo sat in the back seat of the car with Young; Strong and Thomas were in the front seats. Thomas pressed Young for the money he was owed.   According to Mayo, Thomas punched Young and repeatedly asked him for his money.

The day after the murder, the police found the white Audi. Seated inside were Strong, Edwards' and Thomas' infant son, and one other person.   Also found in the car was a .45 caliber shell casing.   About ten days after the murder, Thomas was arrested.   In his coat pocket was a piece of paper which had the following notation, "[a]ll witnesses to where I was from 10 a.m.   until 8:00 o'clock p.m.   in the Budget Motor Inn," followed by a list of names.   One of the persons listed as

"Mrs. Pat" was Patricia Ward. She was not with Thomas on the day of the murder.

Thomas denied shooting Young and claimed that the police had mistaken him for someone else.   Willie Mae Reaves, a resident of the 600 block of 19th Street, N.E., the rear of whose house faced the alley, saw a boy in dark clothes shoot Young, but was unable to identify the shooter.   Thomas also denied having a motive to shoot Young.   He acknowledged being with Young in the white Audi and trying to punch him during a dispute over money, but said the money was owed to Todd Johnson.   Thomas pointed to Strong as the person who was anxious to get the money, and indicated that Strong ordered him to get half the money and said that he, Strong, would go to Young's house to get the other half.   Charles Tucker, Jr., who has prior convictions for larceny, assault with a dangerous weapon, and carrying a pistol without a license, claimed that he heard Strong threaten Young, and that Thomas never showed him a 9mm gun or talked about a .45 caliber pistol.

## THE GOVERNMENT'S PRETRIAL MOTIONS

Prior to Thomas' trial, the government made two motions requesting rulings that certain evidence be admitted.   First, the government wanted to show that Thomas possessed and had access to a gun prior to Young's murder.   Second, the government sought to prove that Thomas lent a gun to Young and gave him some drugs.   Young "lost the gun and somehow disposed of the drugs and was unable to pay [Thomas]"; Thomas threatened Young; demanded his money and when Young failed to pay him, Thomas got a .45 caliber gun from the 18th Street, N.E. house and killed Young.   In his written response, Thomas opposed that part of the government's second motion which concerned testimony from a witness that Thomas said "he shot someone because he owed him money."   Thomas claimed that the witness had recanted her statement.   More-

---

**4.**   Thomas and his baby spent the night of January 24, 1992, with Kelly in her room at the Budget Motel.

**5.**   Young reportedly gave the gun to his sister's boyfriend, Edward Johnson, but could never get it back from him.   Thomas discussed the 9mm gun with Peterson on more than one occasion.

over, Thomas' opposition to the motions stated, "The defendant does not contend that most of the other evidence ... would not be admissible as an integral part of the charged crimes.... [T]he defendant would object to the admission of the evidence as a 'drug debt' ... [because it] would be so prejudicial as to outweigh any probative value."

After hearing argument on the government's motions and the defendant's opposition, the trial court disallowed any testimony about drugs, on prejudice grounds. However, the trial court concluded that evidence concerning the 9mm gun and the money debt fell into the category of *Toliver*[6] rather than *Drew*[7] evidence because the transfer of the gun from Thomas to Young would not be a crime if the gun is properly registered. In addition, the 9mm gun was part of the story leading up to Young's murder, and hence was relevant and probative. Although Thomas argued during the hearing that a witness' testimony regarding the money debt had been recanted, the trial court allowed it in as an admission after reviewing the witness' grand jury testimony and concluding that "there are sufficient indicia of reliability." Further, the trial court stated, the defense could use whatever unsworn recantation it had to impeach the witness.

With regard to evidence concerning Thomas' possession of and access to a gun prior to Young's murder, the government's motion relied on *Jones v. United States*, 477 A.2d 231 (D.C.1984). In his written opposition to the government's motion, Thomas argued that "the government has not proffered any evidence that defendant was in possession of the same type of weapon that is alleged to be the murder weapon." The trial court ruled that the testimony would be admitted under *Jones*.

After his conviction, Thomas filed a timely direct appeal challenging the trial court's admission of evidence relating to the 9mm gun and the .45 caliber pistol. He asserts that the admission of this "other crimes" evidence was more prejudicial than probative.

Thomas also attacks his conviction through a motion under D.C.Code § 23–110, claiming ineffective assistance of counsel because of his trial counsel's alleged conflict of interest. The government opposed the motion, and the trial court denied his § 23–110 motion without a hearing. The trial court determined that Thomas' motion "fails to allege 'with particularity' specific facts and circumstances to substantiate his claim of ineffective assistance of counsel. Further, defendant's claim of trial counsel's conflict of interest is wholly unsupported by the facts of the instant case." Thomas filed a timely appeal.

## ANALYSIS

### The Evidentiary Issues

Thomas argues that the trial court erred in admitting evidence of the 9mm gun and .45 caliber pistol under *Toliver, supra*, and that the admission was highly prejudicial. The government contends that Thomas' access to and possession of the .45 caliber pistol was direct evidence of the murder charge and the 9mm gun is directly relevant to the charged crime, or admissible under *Drew*. Even if Thomas' argument is accorded plain error review, the government states, there was neither obvious error, nor a miscarriage of justice.

The determination of whether "other crimes" evidence is admissible under *Drew* as evidence of motive or intent, or under *Toliver* to explain the circumstances surrounding a crime; and whether the probative value of the proposed evidence outweighs its prejudicial effect, is committed to the discretion of the trial court. *Parker v. United States*, 586 A.2d 720, 724 (D.C.1991); *Jones v. United States, supra*. In addition, "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." *Coleman v. United States*, 379 A.2d 710, 712 (D.C.1977). Moreover " 'events so closely related to the charged offense in time and place that they are necessary to complete the story of the crime ... by placing it in context of nearby

---

**6.** *Toliver v. United States*, 468 A.2d 958 (D.C. 1983).

**7.** *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

and nearly contemporaneous happenings'" are admissible. *Holmes v. United States,* 580 A.2d 1259, 1266 (D.C.1990) (quoting *Williams v. United States,* 549 A.2d 328, 333 (D.C.1988)).

■ We conclude that the trial court did not abuse its discretion in admitting evidence relating to the 9mm gun or to the .45 caliber pistol. Evidence concerning the 9mm gun was directly relevant to the charged crime, and demonstrated the circumstances surrounding the crime. Hence it was admissible under *Toliver.* It was also admissible under *Drew* to show Thomas' motive for the crime. Moreover, the trial judge properly concluded that the probative value of this evidence outweighed its potential for undue prejudice. *Reed v. United States,* 584 A.2d 585, 591 (D.C.1990); *see also Johnson v. United States,* 683 A.2d 1087, 1100 (D.C.1996).

■ We also conclude that the trial court did not abuse its discretion in admitting testimony pertaining to the .45 caliber pistol. Under *Jones, supra,* Thomas' access to and possession of a .45 caliber pistol just weeks before Young's murder constituted "a probative temporal connection" with Young's murder, and "was admissible to show ... intent, even though the probative value of the prior gun evidence was diminished in the absence of testimony to identify the murder weapon as [Thomas'] gun." 477 A.2d at 239. *See also Coleman, supra,* 379 A.2d at 712. Furthermore, the testimony regarding the .45 caliber pistol "constituted evidence of the crime charged" and hence was admissible. *Ali v. United States,* 581 A.2d 368, 377 (D.C. 1990).

Accordingly, for the foregoing reasons we hold that the trial court did not abuse its discretion in permitting the government to introduce testimony concerning the 9mm gun and .45 caliber pistol. Thus, we affirm the trial court's judgment in No. 92–CF–1349.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Thomas contends that the trial court erred in not granting his request for a hearing on his allegation of ineffective assistance of counsel. He swore in an affidavit that his trial counsel, Ms. Betty Hunter visited him at Lorton after his trial and told him "that she had messed up in my case, and that I should consider filing a 23–110 against her." Ms. Hunter did not respond to a written request that she meet with Thomas' new counsel regarding the facts of the case and Thomas' allegation. Thomas relies on *United States v. Harris,* 846 F.Supp. 121 (D.D.C.1994), in arguing that he was denied effective assistance of counsel under the Sixth Amendment to the Constitution; and hence, his conviction should be vacated. He asserts that Ms. Hunter "was involved in a longstanding, adulterous affair" with [a] Fifth District police officer, Marcello Muzzatti, at a time when "Fifth District Police Officers played crucial roles [in his] case." As a result, he maintains, her cross-examination of the police officers "was woefully inadequate [b]oth with respect to the amount of time spent questioning these witnesses, and the generally 'soft ball' questions ... directed toward the officers." He also faults Ms. Hunter for not calling witnesses who could address his mistaken identity theory. Thomas did not identify one of these witnesses; he identified the other as "Dorris Mar Wilkerson." Further, Thomas charges Ms. Hunter with other alleged deficiencies, including the failure to file a suppression motion, and being "very friendly with the District Attorney [sic] & police." Thomas insists that he was entitled to a hearing on these allegations.

The government takes issue with Thomas' assertion that he was entitled to an evidentiary hearing. He was not, says the government, because his allegations against Ms. Hunter are vague and conclusory, and trial counsel's performance was not deficient. With regard to the failure of Thomas' counsel to call two witnesses, the government observes that the name of one was not revealed, but makes no argument concerning "Dorris Mar Wilkerson." Finally, the government argues that even if Thomas' counsel's performance was deficient, he cannot demonstrate the requisite prejudice necessary to reverse his conviction, because of the overwhelming evidence against him, including that of two eyewitnesses who lived in the area where Young was killed, who had a

clear view of the murder, had seen Thomas previously in the neighborhood, and were able to identify Thomas as the perpetrator.

■ "There is a presumption in favor of holding a hearing on a § 23–110 motion alleging ineffective assistance of counsel that requires an inquiry into matters outside the record." *Ready v. United States,* 620 A.2d 233, 234 (D.C.1993). However, we have also said that "a hearing is unnecessary when the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Id.* Although the government describes Thomas' allegations as "vague and conclusory," "the existing record [does not provide] an adequate basis for disposing of [his] motion." This is particularly true because of his allegation that Ms. Hunter told him she "messed up in his case" and he "should consider filing a 23–110 against her"; and because of his allegation that his representation was compromised by her alleged conflict of interest.

■ Absent an alleged conflict of interest, we would apply the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 689, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984) to determine whether Ms. Hunter's performance was deficient, and if so, whether Thomas suffered prejudice to the extent that the result of his trial would have been different. Thomas would be required to demonstrate both deficient performance and prejudice. We apply a different standard, however, where a conflict of interest has been alleged.[8] That standard does not require proof of prejudice, but only a showing that counsel's representation was adversely affected by an actual conflict of interest.

■ In *Witherspoon v. United States,* 557 A.2d 587 (D.C.1989) we said, "[t]he Sixth Amendment guarantee of assistance of counsel for an accused's defense requires 'representation that is free from conflicts of interest.'" 557 A.2d at 590 (quoting *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981)). Prejudice is presumed whenever a defendant establishes that his attorney had "an actual conflict of interest [that] adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). Therefore, "[t]o protect the defendant's right to counsel that is free of conflicts of interest, the trial court has an affirmative duty to inquire into the effectiveness of counsel whenever the *possibility* of a conflict becomes apparent before or during trial." *Witherspoon, supra,* 557 A.2d at 590 (internal quotations omitted)(emphasis in original); *see also Singley v. United States,* 548 A.2d 780 (D.C.1988). We hold that the "affirmative duty to inquire" is also applicable to the post-trial period when allegations surface that an alleged conflict of interest had an adverse impact on the attorney's representation.

■ The trial court denied Thomas' request for a hearing, despite the presumption in favor of the hearing. Understandably, the trial judge was skeptical about Thomas' allegations after having sat through an extensive trial involving approximately 25 witnesses and after having had a chance to assess Thomas' credibility during trial. Nonetheless, our cases make clear that there is a presumption in favor of a hearing. And, while it may be possible to make a judgment on the record concerning allegations that Ms. Hunter's cross-examination of police officers was inadequate, we have no factual record on which to decide whether Ms. Hunter told Thomas that she "messed up in his case" and that he should consider filing a motion under D.C.Code § 23–110. Nor can we ascertain whether Ms. Hunter's intimate personal relationship with a Fifth District police officer adversely affected her performance as Thomas' counsel. We are mindful of the *Harris* case, in which a conviction was vacated because Ms. Hunter had an actual conflict of interest in representing Harris, due to her intimate personal relationship with Officer Muzzatti, who testified against Harris. The record here is silent as to whether Officer Muzzatti played any role in the investigation of Young's murder, or supervised or was

---

8. Judge Farrell's concurrence highlights the difference between the usual ineffective assistance of counsel case, and one involving an allegation of a conflict of interest.

supervised by, or was otherwise close to any of the officers who conducted the investigation, or testified at Thomas' trial. The government points to a footnote in *Harris* in which the court rejected the argument that "Ms. Hunter's numerous platonic, personal relationships with other Fifth District vice officers creates an actual conflict of interest." 846 F.Supp. at 127. Nonetheless, as the court said in *Harris,* "[t]he appearance of impropriety looms ominously over ... this case." *Id.* at 133. This is particularly true in the absence of any explanation, affidavit or testimony from Ms. Hunter in response to Thomas' affidavit.

The allegation of a conflict of interest is a serious one .because a lawyer's professional judgment may be adversely affected by such conflict. Rules 1.7(b) and (c) of the District of Columbia Rules of Professional Responsibility provide in pertinent part:

> (b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if: ...

> (4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

> (c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if:

> (1) Each potentially affected client provides consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and

> (2) The lawyer is able to comply with all other applicable rules with respect to such representation.

Because we cannot determine on the record before us whether Ms. Hunter's professional judgment on behalf of Thomas was adversely affected by her intimate personal relationship with an officer of the Fifth District, whose colleagues conducted an investigation of the murder with which Thomas was charged and testified as government witnesses, we reluctantly vacate the trial court's order in No. 95–CO–1577, and remand the matter to the trial court for a hearing on Thomas' motion under D.C.Code § 23–110.

*So ordered.*

FARRELL, Associate Judge, concurring.

I agree that a hearing is necessary on appellant's Sixth Amendment claim, but only because the case involves a potential conflict of interest on the part of appellant's trial counsel. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Were this an ordinary claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), appellant would not be entitled to a hearing because his assertions of deficient performance are too vague and conclusory or are refuted by the record.[1] But here the reasonable possibility of a conflict of interest is enough to warrant inquiry if appellant can also show that the conflict (if any) adversely affected his lawyer's performance, *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719—a showing less difficult to make than under *Strickland*'s prejudice requirement. Yet, *because* appellant must show an adverse effect on counsel's performance, the hearing may well be a very short one. That is, the judge may go right to the "adverse effect" question and leave aside a potentially lengthier probe of Ms. Hunter's social relationship with other Fifth District police officers besides Muzzatti. Whether or not Ms. Hunter admits telling appellant that she "messed up" the case, if the judge can find no act or omission of hers that, objectively viewed, affected appel-

---

1. Appellant's complaint that counsel's cross-examination of the police witnesses was inadequate is wholly conclusory and not borne out by the trial record. Even at oral argument his attorney could not point to any matter which the cross-examination failed to explore. Appellant's assertion, without any particularization, that counsel was deficient in failing to call two witnesses (one named, the other not) is likewise vague and conclusory. And certainly it cannot be that a defendant obtains a hearing under *Strickland* merely by citing a statement of his counsel post-trial that she "messed up" the case and that the defendant should file a § 23–110 motion.

lant's defense adversely[2] that will end the inquiry.

2. The test for "adverse effect" applied by the district judge in *United States v. Harris*, 846 F.Supp. 121 (D.D.C.1994), quoting federal appellate court decisions, requires the defendant first to

demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient

substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Id.* at 129 (quoting *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989) (further citations omitted)).