**UNITED STATES of America,
Plaintiff,**

**v.**

**Gerald W. WEAVER, II, Defendant.**

**Crim. No. 92–453 (TFH).**

United States District Court,
District of Columbia.

June 7, 2000.

**2**

Joan Draper, Assistant U.S. Attorney, Washington, DC, for Plaintiff.

Gerald W. Weaver II, Wexford, PA, pro se.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Pending before the Court is defendant's Motion to Set Aside, Vacate, and Reverse Judgment of Conviction, pursuant to 28 U.S.C. § 2255. Upon careful consideration of the briefs, the testimony presented at the four hearings held in this case, and the entire record herein, the Court will deny defendant's Motion in its entirety.

## I. BACKGROUND

By a fourteen count indictment filed November 22, 1992, the Grand Jury charged defendant Gerald Weaver II ("Weaver") with Obstruction of Justice, in violation of 18 U.S.C. § 1503; Tampering with a Witness, in violation of 18 U.S.C. § 1512(b)(3); Conspiracy to Possess Cocaine, in violation of 21 U.S.C. § 846; nine counts of Possession of Cocaine, in violation of 21 U.S.C. § 844; Distribution of Cocaine, in violation of 21 U.S.C. § 841; and Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371.

On February 16, 1993, the Grand Jury returned a twenty-one count superseding indictment charging the original counts, as well as nine additional counts of Distribution of Cocaine, in violation of 21 U.S.C. § 841.[1]

On March 31, 1993, Weaver entered guilty pleas before Judge Norma Holloway Johnson to three counts of the indictment: conspiracy to distribute a controlled substance, distribution of a controlled substance, and obstruction of justice.[2] His plea agreement provided:

Within one year of the imposition of sentence, the United States Attorney may review the timeliness, nature, extent, completeness, accuracy, truthfulness, assistance, and testimony of Gerald W. Weaver II. If the United States Attorney determines Gerald W. Weaver II has provided substantial assistance in the investigation or prosecution of other persons, the United States Attorney may, in his discretion, file motions under Title 18, United States Code, Section 3553(e), and Rule 35(b), Federal Rules of Criminal Procedure advising the District Court of the assistance to law enforcement authorities. Gerald W. Weaver II has no right to compel or require

---

1. During this time, prior to his appointment to the Superior Court of the District of Columbia, Weaver was represented by Judge Russell F. Canan ("Canan").

2. Weaver was represented at this time by Jeffrey O'Toole ("O'Toole"), who entered his appearance on March 11, 1993.

that the United States Attorney will file such a motion.

Plea Agreement at ¶ 14.

Consistent with the plea agreement, Weaver was interviewed in the United States Attorneys' Office on March 29, 1993, and April 29, 1993.[3] Three months later, on June 30, 1993, after a sentencing hearing in which the Court awarded a two-level reduction in the offense level for acceptance of responsibility, defendant was sentenced to a period of twenty-four months confinement on each count, to be served concurrently, followed by concurrent terms of thirty-six months supervised release.[4]

On July 28, 1993, Mundy wrote to the United States Attorney asking whether a decision on submitting a Motion for Reduction of Sentence had been made, and in the event that a decision had not been reached, requesting a delay in Weaver's surrender date.[5] On August 5, 1993, Assistant United States Attorney Thomas Motley ("Motley") denied Mundy's requests and advised that,

> "[a]s of this time, the information has not provided substantial assistance in the prosecution of another person who has committed an offense." [6]

On August 16, 1993, Weaver surrendered to the Bureau of Prisons.

On May 31, 1994, Congressman Daniel Rostenkowski ("Rostenkowski") was indicted. On July 6, 1994, Mundy entered an appearance on behalf of Rostenkowski. The Government immediately brought this potential conflict of interest to the attention of the Court, but represented to the Court that the government believed it could resolve this issue directly with Mundy, without the Court's assistance. On October 16, 1994, the government, unable to resolve the issue with Mundy directly, filed in the *Rostenkowski* action a Motion to Disqualify Defense Counsel Based Upon Conflicts of Interest. *See* Gov't Opp., Exhibit 1. Mundy passed away before the Court had a chance to rule upon the government's Motion, and the Motion was subsequently dismissed as moot.

On October 18, 1994, Congressman Kolter was indicted. On November 14, 1994, the government filed a Motion to Reduce Sentence, pursuant to Fed.R.Crim.P. 35, which included information for *in camera* review.[7] In a written order filed on December 21, 1994, Judge Johnson granted the government's Motion and reduced defendant's sentence to "time served," followed by the original period of supervised release, thirty-six months.[8]

---

3. As a former Administrative Assistance to Congressman Joseph Kolter ("Kolter"), Weaver provided information about criminal conduct related to the House of Representatives Post Office. The government later represented in an *Ex Parte, In Camera* Submission in Support of its Motion to Reduce the Sentence of Gerald W. Weaver II, filed on November 14, 1994, that defendant's

> information was important to the indictment of Congressman Joseph P. Kolter on October 18, 1994 (*U.S. v. Joseph Kolter*, 94–404(NHJ)). Mr. Weaver also provided information that may be used in the trial of Congressman Daniel Rostenkowski, who was indicted on May 31, 1994 (*U.S. v. Daniel Rostenkowski*, 94–226(NHJ)).

4. Weaver was represented at this time by new counsel, R. Kenneth Mundy ("Mundy"), who had entered his appearance on June 11, 1993.

5. Mundy noted that "House Postmaster Robert Rota had recently pled guilty and may be

offering evidence against Congressman Kolter, corroborative and confirmatory of the considerable information provided by my client." *See* Gov't Opp., Exhibit 1, attachment 6.

6. Specifically, Motley indicated that, "[t]he information which Mr. Weaver has provided did not assist us in obtaining the guilty plea of former House Postmaster Robert Rota." *See* Gov't Opp., Exhibit 1, attachment 7.

7. Weaver had retained new counsel in October of 1994. On October 19, 1994, Michael Bachner ("Bachner") wrote to the United States Attorney's Office asking that a request for a reduction of Weaver's sentence be taken to the Departure Committee. *See* Gov't Opp., Exhibit 2.

8. With the original sentence, Weaver's incarceration would have run from August 16, 1993 through August 16, 1995. As a result of

On February 24, 1997, Weaver filed the instant Motion to Set Aside, Vacate, and Reverse Conviction, pursuant to 28 U.S.C. § 2255. On August 11, 1997, after Judge Johnson recused herself and Weaver's case was reassigned [9], Judge Urbina stayed the supervised release portion of the defendant's sentence. On September 11, 1997, the United States moved for a formal Court Ruling on the Waiver of the Attorney–Client Privilege with regard to Canan and O'Toole. On September 18, 1997, the government filed an Opposition to Defendant's Motion to Set Aside, Vacate, and Reverse Judgment of Conviction, addressing the Mundy representation.

On September 24, 1997 and again on September 30, 1997, Weaver filed motions for additional time to file supplemental pleadings. These motions were unopposed and were granted by Judge Urbina on October 3, 1997. On October 27, 1997, Weaver filed his reply to the government's opposition to his Motion to Set Aside, Vacate, and Reverse Judgment of Conviction. Also on that date, Weaver petitioned to proceed *pro se* in filing another reply to the government's opposition. On November 4, 1997, Weaver moved to dismiss his court-appointed attorney and to proceed *pro se.* On January 20, 1998, Judge Urbina granted the motion of John Anthony Briley, Jr., Weaver's court-appointed attorney, to withdraw as counsel.

Between March 9 and March 12, 1998, Weaver filed three supplements to his § 2255 Motion. On May 28, 1998, Weaver filed a motion for default judgment and order reversing his conviction for failure of the Court to hold a "prompt hearing." On June 8, 1998, Weaver filed for sanctions against the opposing attorney. On June 16, 1998, Judge Urbina granted the government's motion to waive Weaver's attorney-client privilege. On June 18, 1998, the Court received the government's response to the claims regarding O'Toole and Canan in defendant's § 2255 motion.

On June 22, 1998, Weaver moved for Reconsideration of the Ruling on the Waiver of the Attorney–Client Privilege and also for Default Judgment. On August 17, 1998, Weaver filed a Notice of Appeal from Judge Urbina's August 6, 1998 order denying Weaver's motion for reconsideration of the Court's ruling on the government's motion to waive Weaver's attorney-client privilege. Subsequently, Weaver petitioned for Writ of Mandamus in the United States Court of Appeals for the District of Columbia. On September 11, 1998, the Court of Appeals vacated Judge Urbina's Order on the Attorney–Client privilege issues; the Court of Appeals also denied Weaver's petition for mandamus.

On October 9, 1998, this case was reassigned from Judge Urbina to Judge Hogan at the direction of the Calendar Committee. On October 28, 1998, the Court of Appeals dismissed as moot defendant's appeal of Judge Urbina's order denying his motion for default judgment. On November 2, 1998, the Court convened a status conference to review the pending motions. On January 4, 1999, the Court held that Weaver had waived his attorney-client privileges as to attorneys Canan and O'Toole. On March 5, 1999, the government filed its supplemental opposition to defendant's § 2255 Motion.

Weaver then filed a Superseding Motion for Default Judgment and/or Summary Judgment on February 19, 1999; a Motion to Alter or Amend Judgment on March 5,

---

the government's motion and Judge Johnson's ruling, Weaver's incarceration ran from August 16, 1993 to December 21, 1994, a total of 16 months and 5 days. His counsel acknowledged in the defendant's Response to the Government's Rule 35 Motion that Weaver had been transferred to a halfway house on November 14, 1994. Accordingly, Weaver's "actual incarceration in prison" constituted one

year and three months. *See* 12/12/94 letter of Michael Bachner to Judge Johnson at 4.

9. Weaver's case was randomly reassigned from Judge Johnson to Judge Urbina by direction of the Calendar Committee on April 23, 1997.

1999; a reply memorandum in support of his § 2255 Motion on March 17, 1999; a Final Superseding Motion for Default Judgment and/or Summary Judgment on November 16, 1999; a Statement of Undisputed Facts and Conclusions of Law Preparatory to the December 6, 1999 hearing on November 16, 1999; a Closing Argument and Post–Hearing Brief on April 5, 2000; and a Reply to the Government's Closing Argument on May 29, 2000.

On December 6, 1999, this Court began the first of four evidentiary hearings on defendant's § 2255 Motion. Subsequent hearings were held on December 13, 1999; March 10, 2000 [10]; and April 5, 2000. Some witnesses were provided voluntarily by the government, and those unwilling to appear were subpoenaed by the Court, at Weaver's request.

## II. DISCUSSION

A defendant claiming a conflict of interest is required to show that his attorney made a choice advancing his own interests to the detriment of his client's interests. *United States v. Bruce*, 89 F.3d 886, 893 (D.C.Cir.1996). The conflict of interest in this case allegedly arose when Mundy, defendant's sentencing attorney, entered his appearance at the arraignment

of Congressman Rostenkowksi in July of 1994.[11] However, to obtain relief pursuant to a conflict of interest claim, a defendant must show that "a conflict of interest *adversely affected* the adequacy of [his attorney's] representation." *Cuyler v. Sullivan*, 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *see also United States v. Harris*, 846 F.Supp. 121, 128 (D.D.C.1994) ("an actual conflict of interest is not enough for a presumption of prejudice. The second prong of this standard requires that the conflict have an *adverse effect* upon the attorney's performance") (emphasis added). To demonstrate "adverse effect," a defendant must establish that "an actual lapse in representation" resulted from the conflict. *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir.1993), quoting *Cuyler*, 446 U.S. at 336, 100 S.Ct. 1708.

Defendant argues that his sentencing attorney's failure to contact the government after the *Rostenkowski* indictment on May 31, 1994, and his attorney's failure to renew the defense request for the government to submit a Rule 35(b) motion arguing for a reduction in his client's sentence, establishes a meritorious conflict of interest claim. *See* Def. Closing at 10. Assuming that Mundy had not previously terminated his representation of Weaver [12],

---

10. This March 10 hearing date was originally scheduled for January 6 but was continued at defendant's request since he had not followed the proper Court procedures for having his witnesses subpoenaed. The Court offered defendant hearing dates in February, but Weaver insisted that he needed the testimony of Motley who was out of the office from January 20, 2000 through the month of February. March 10 was selected since it was the first available Court date after Motley returned.

11. The conflict of interest of Mundy in July of 1994 with regard to the *Rostenkowski* action is undisputed by the government. This is true because, whether Weaver was a former or current client of Mundy, the District of Columbia Rules ("D.C.Rules") of Professional Conduct clearly dictate that Mundy should not have entered his appearance in a case involving a person against whom his client or former client was cooperating. *See* D.C. Rules 1.7 and 1.9. However, this case is

concerned exclusively with the effect of that conflict of interest on Mr. Weaver's case. The government argues that Mundy's conflict did not adversely affect his representation of Weaver and that therefore there was only limited, if any, prejudice. Weaver argues that Mundy's conflict of interest tainted Weaver's entire case and justifies the withdrawal of his pleas and the reversal of his convictions.

12. The Court notes that there is some evidence in the record to suggest that Mundy may have effectively terminated his relationship with Weaver prior to the entry of his appearance in the *Rostenkowski* action. *See* Opp. to Motion to Disqualify Defense Attorney at 5–7 (citing a March 31, 1994 letter from Mundy to Weaver, in which Mundy advises Weaver that Motley rejected Mundy's request for a reduction of sentence and that there was nothing further that could be done for Weaver.); *see also Id.* at 6 (citing Mundy's affidavit, in which Mundy explained that, after receiv-

the Court acknowledges that an actual conflict of interest would have existed from the time Mundy entered his appearance for Rostenkowski in July of 1994 until the time Weaver retained new counsel in this case in October of 1994. However, the Court strongly disagrees with defendant's contention that this conflict of interest, assuming it did indeed exist, requires an automatic reversal of his convictions by way of his guilty pleas. The Court finds that even if there was a conflict of interest in this case, that conflict did not result in any "adverse impact" on Weaver's case. Therefore, there is insufficient evidence of manifest injustice or adverse effect to allow this defendant to withdraw his guilty pleas and to vacate his convictions.

## A. Weaver Has Not Met the Standards of Manifest Injustice Governing Plea Withdrawals

 To mount a successful post-sentence attack on a guilty plea, a defendant must establish that permitting the plea to stand would result in "manifest injustice." *United States v. McKoy*, 645 F.2d 1037, 1040 n. 3 (D.C.Cir.1981). Moreover, to prevail on a motion to vacate, set aside, or reverse conviction pursuant to 28 U.S.C. § 2255, a defendant must show "a fundamental defect, which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *see also United States v. Farley*, 72 F.3d 158, 162 (D.C.Cir.1995); *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C.Cir.1992), *cert. denied*, 506 U.S. 915, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992). Weaver has not satisfied these standards.

### 1. No Error In Rule 11 Colloquy

 Weaver has not alleged any defect in the Rule 11 colloquy. The regularity of the Rule 11 proceedings is the "most important factor" for the Court to consider in reviewing a motion to vacate a conviction. *United States v. Cray*, 47 F.3d 1203, 1207 (D.C.Cir.1995) (defendant must show either error in taking the plea or some "more substantial" reason he failed to press his case rather than plead guilty). Weaver does not allege, nor does the record reflect, any error in the Rule 11 colloquy in this case.

### 2. No Merit to Ineffective Assistance Claims Against Plea Attorneys

Weaver raises several ineffective assistance claims against his plea attorneys. However, these arguments contradict the testimony at the evidentiary hearings. At the December 13, 1999 hearing, Canan detailed his thorough investigation and preparation of defendant's case. *See* Tr. 12/13/99 at 30–33, 39. He further explained that, "once he was nominated to the Superior Court of the District of Columbia, he withdrew from nearly all of his active trial cases, and then tried to match his clients with specific attorneys who could handle their matters." *Id.* at 16–17, 46–47. In Weaver's case, Canan testified that he recommended O'Toole, because he personally knew O'Toole as a competent and well-respected criminal defense attorney who could effectively handle Weaver's federal case. *Id.* at 23, 47, 51. In addition to testifying that O'Toole was "the person I would go to if I ever got into a jam," Tr. 12/13/99 at 47, Canan also explained that O'Toole had a break in his schedule and was free to devote the entire upcoming

---

ing a May 24, 1994 letter from Weaver urging Mundy to do more on the cooperation issue, Mundy "called for him at McKean Satellite Camp to explain that there was nothing more I could do and to tell him I considered the matter of representation completed."). However, since Mundy is not available to testify and since his affidavit explains that, although Mundy "left word for Mr. Weaver to call," his

call was never returned, Mundy aff., no. 10, for purposes of this Motion, the Court will assume that Mundy was still representing Weaver during the period in question. Nevertheless, it is worth noting that there may indeed be no conflict of interest in Weaver's case since Mundy may have terminated his relationship with Weaver before he entered his appearance for Rostenkowski.

month to the final investigation and trial preparations of defendant's case. Tr. 12/13/99 at 48; *see also* Tr. 12/6/99 at 31–32, 42–43, 50–51. Therefore, with Weaver's consent, Canan, O'Toole, and Weaver met and discussed the case extensively. Tr. 12/6/99 at 29–30, 51–52. At the end of the day, Weaver decided to accept the representation of O'Toole. *Id.* At that time, Weaver also accepted the proposal by Canan to pay O'Toole half of the retained fee he had received from the defendant. Tr. 12/6/99 at 34–39, 52; Tr. 12/13/99 at 51–52.

O'Toole testified that Weaver authorized him to begin plea negotiations after O'Toole conveyed his impressions of the case.[13] Subsequently, O'Toole had numerous conversations and meetings with Motley, and the parties successfully negotiated a plea agreement that: (1) limited the defendant's guideline exposure by stipulating to a specific amount of drugs involved in the conspiracy; (2) obligating the defendant to plead guilty to Obstruction of Justice; and (3) offering the defendant the potential to reduce his sentence through cooperation and the possibility of a Rule 35(b) motion. Tr. 12/6/99 at 62–63.

Defendant argues that O'Toole was ineffective when he failed to move for a continuance, after he took over defendant's case, despite Weaver's feelings on the subject. *See* Def. Closing at 46. Defendant claims that O'Toole chose not to move for this continuance because it would have been denied by Judge Johnson, and because it would have required O'Toole's "friend and colleague Russ Canan" to stay on the case. Def. Closing at 48. Weaver alleges a conflict of interest between Canan and O'Toole, claiming "at this point, it was in the interest of Mr. O'Toole and in the interest of his friend, payor, former law partner, and future judge Russell Canan to see Mr. Weaver swept into federal prison as swiftly as possible." *Id.* at 53. The Court finds no evidence in the record to support these assertions. O'Toole testified that he received a well-prepared and investigated case, and after re-investigating the charges and speaking with almost all the lawyers representing the witnesses that were going to testify, he did not feel that he had a good faith basis to request a continuance, nor did he feel that he needed one. Tr. 12/6/99 at 78–80, 83–85.

■ Based upon the testimony at the four evidentiary hearings as well as all evidence in the record, this Court cannot find any support for Weaver's assertion that "but for [his] counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In fact, the transcript of Weaver's plea shows that Weaver was explicitly asked whether or not he was satisfied with his counsels' representation and he answered affirmatively. *See* 3/31/93 Tr. at 7. Therefore, this Court finds no merit to Weaver's claims of ineffective assistance of counsel against attorneys Canan or O'Toole.

### 3. Defendant Has Made No Attempt to Refute his Guilt

■ A defendant's failure to assert his innocence, although not in itself dispositive, "certainly mitigates against withdrawal." *United States v. Horne,* 987 F.2d 833, 837 (D.C.Cir.1993). Moreover, for a plea withdrawal motion to be successful, a defendant must set forth a "legally cognizable defense" to the charge against him. *United States v. Cray,* 47 F.3d 1203, 1207 (D.C.Cir.1995). This is something more than "a general denial in order to put the government to its proof; he must affirmatively advance an objectively reasonable argument that he is innocent, *see U.S. v. Barker,* 514 F.2d 208, 226 n. 17 (D.C.Cir.1975), for he has waived his right to simply

---

13. Specifically, O'Toole testified that, after re-investigating and preparing the case for trial, it became evident to him that Weaver was going to be found guilty and that he would be incarcerated for much longer than he wanted to be. Tr. 12/6/99 at 55–58.

try his luck before a jury." *Cray*, 47 F.3d at 1209.

At the hearing on defendant's motion, testimony was elicited that defendant admitted his guilt to the charged offenses not only during the plea colloquy and to the presentence report writer, but also to his plea attorneys [14], *see* Tr. 12/13/99 at 26, 28, 44–46; Tr. 12/6/99, at 60–62, 64, 90, 95–96, as well as to Assistant United States Attorney Thomas Motley. Tr. 3/10/00 at 78. Judge John Campbell ("Campbell"), Chief of the Public Corruption and Government Fraud Section in the United States Attorneys Office at the time of Weaver's case, also testified that he had no doubt that Weaver would have been convicted of Obstruction of Justice had he proceeded to trial, since the government had him "dead to rights, as it were, we had him on tape." Tr. 3/10/00 at 30.

While the right to effective assistance of counsel is not "conditioned upon actual innocence," the standards for a Court to review when a defendant requests a Court to withdraw his guilty plea do include a review of the defendant's failure to assert his innocence.

### 4. The Prejudice to the United States Would be Substantial

▮ In evaluating a motion to withdraw a guilty plea, the Court must also consider the prejudice to the government should defendant's motion be granted and the case returned to the trial calendar. It is clear that reconstructing this case now, seven years after Weaver's guilty pleas and more than ten years after the commission of the offenses, would be difficult if not impossible.[15] *See* Tr. 3/10/00 at 32–33 (Campbell testified that reconstructing this case would be "difficult" because "one of the witnesses had died," he had no idea "what procedures were in place [in 1993] for preserving the evidence," and only one of the prosecutors who had worked on this case was still in the United States Attorneys office); Tr. 3/10/00 at 75, 77 (Motley testified that he did not know whether this case could be reconstructed for trial in 2000, because there were between 15 and 20 major witnesses who would have to be called back and even in 1993 "there were numerous witnesses that did not really want to be involved in this case"; in addition, Motley explained that many of the witnesses had pled guilty in their own cases, and by 2000 their terms of probation or incarceration would have expired).

Because Weaver has not met the "exceptionally high standards" to justify plea withdrawal when the government would be prejudiced by such withdrawal, *Horne*, 987 F.2d at 837; because Weaver has not shown that his plea proceeding was infected by harmful error; and because he has not asserted an "objectively reasonable argument that he is innocent," *Cray*, 47 F.3d at 1209, the Court finds that Weaver has not met the standard of manifest injustice governing withdrawal of guilty pleas.

### B. Defendant Has Suffered No Adverse Effect in this Case

Weaver's main argument for the reversal of his convictions is that Mundy's alleged conflict of interest after he entered his appearance for Rostenkowski, "seriously impaired [his] representation of Mr.

---

14. There were further admissions of guilt both by the defendant himself and his witnesses at the June 30, 1993 sentencing before Judge Johnson. *See* Tr. 6/30/93.

15. Weaver argues that this delay is solely attributable to the government's refusal to concede defendant's alleged prejudice, *see* Def. Closing at 34, and to the Court's failure to hold a prompt hearing on his § 2255 Motion, *id.* at 41–42, and thus cannot be held against him. However, the Court reminds defendant that he did not file his Motion to Vacate Sentence and Conviction until three and a half years after sentencing and six months after filing his civil malpractice suit against Mundy. Moreover, defendant's habit of filing numerous lengthy pleadings may itself have slowed the pace of his proceedings. In any case, the four evidentiary hearings held in this case far exceed the typical treatment for a § 2255 motion.

Weaver." *See* Def. Closing at 4. Specifically, Weaver suggests that Mundy's conflict prevented him from renewing the defense request for a Rule 35(b) motion and that the value of Weaver's cooperation was called into question by Mundy's attorney who "attacked [Weaver's] credibility" in a meeting with the government prosecutors. *Id.* According to Weaver, this "tainted the government's later Rule 35(b) motion for a final and reduced sentence in a way that was difficult if not impossible to measure." *Id.* at 12. The Court disagrees with defendant's assertions.

### 1. The Majority of Weaver's Cooperation Centered on Congressman Kolter

■ While the Court acknowledges that, assuming Mundy was still representing Weaver, there was a conflict of interest in Weaver's case once Mundy accepted Rostenkowski as a client; it is not at all clear from the testimony of the government's attorneys who were investigating the House Post Office case that they would have recommended the defendant for a reduction of sentence in June of 1994, had Mundy approached them after the *Rostenkowski* indictment on May 31, 1994. In fact, the evidence weighs strongly against Weaver's assumption that a Rule 35(b) motion would have been recommended at that time. First, there was a feeling among the prosecutors that Weaver had already received a substantial break in his sentence. *See* Opp. to Motion to Disqualify at 5, quoting from 3/31/94 letter from Mundy to Weaver ("Motley feels you received a substantial break in your sentence. As you probably know, this is the feeling of most prosecutors.") Second, all of the witnesses who testified at the four evidentiary hearings, aside from the defendant's own wife, questioned the weight of Weaver's assistance in the prosecution of Rostenkowski. *See* Tr. 12/13/99 at 35; Tr. 12/6/99 at 24, 27, 44–45, 65, 93.

It is clear that Weaver could have been a significant witness had Rostenkowski's case gone to trial and had he actually been asked to testify. However, as Campbell explained, "[the government was] still a long way from trial," and there was no way of knowing whether defendant would actually have been called as a witness at Rostenkowski's trial because Weaver was "an impaired witness ... damaged goods, if you will." [16] ·Tr. 3/10/00 at 28–29. Moreover, there is no proof that had Weaver's attorney renewed the defense request for a Rule 35(b) motion, the government would have submitted that request to the Departure Committee. *See* 3/10/00 at 107 (Assistant United States Attorney Larry Parkinson testified that the help that Weaver had provided, "simply that piece that related to Congressman Rostenkowski," was not significant enough, to warrant a recommendation for a 35(b) motion); *see also* Tr. 3/10/00 at 33–34 (Campbell testified that "[i]f we had thought about it—it would have surprised us that there wasn't one, that a request had not come in, but I can't say that [we] would have submitted it. We would have evaluated it, we would have thought about it. ... it is possible that we would have submitted one then ..., but I can't say it was [certain]."). In fact, Motley testified that Weaver's chances of getting a Rule 35(b) motion based on the information he provided about Congressman Rostenkowki were "extremely questionable." *See* Tr. 3/10/00 at 87–88. Motley explained that although the government had contemplat-

---

16. Campbell further explained, "He pleaded guilty to Obstruction of Justice among other things, and that means that he not only admitted his guilt to a felony offense, but he had admitted lying and getting other people to lie, and he admitted doing that in the context of a court proceeding, which is the very ... context [in which] we would be asking the jury to believe him." Tr. 3/10/00 at 29. Similarly, Canan previously testified that "Mr. Motley made it quite clear that he viewed Mr. Weaver as—as we said in the trade at that time—'damaged goods.'" He had perjury matters. He had obstruction of justice matters. He was an attorney to boot. He was going to be a difficult witness for the government to sponsor. 12/13/99 Tr. at 43.

ed using Weaver as a witness if Rostenkowki went to trial, "there is a difference between being a witness and providing substantial assistance in the prosecution of another." *Id.* Therefore, there is no evidence that Weaver would have received his Rule 35(b) motion earlier had Mundy not entered his appearance for Rostenkowski.

Moreover, Weaver's argument that the value of his cooperation was diminished when Mundy sent his own attorney, Jacob Stein ("Stein"), to speak with the prosecutors on the "alleged" conflict of interest, Def. Closing at 12, is not borne out by the hearing evidence. Although Stein told the prosecutors that he did not believe that the United States would call Weaver as a witness at Rostenkowski's trial, the United States persisted in the argument that Mundy's representation of Rostenkowski did, in fact, present a conflict of interest in the *Rostenkowski* action. *See* Tr. 3/10/00 at 64. In fact, in October of 1994, the prosecutors not only filed a formal Motion to Disqualify Mundy from further representation of Rostenkowski; but a few weeks later the government delivered to chambers the Government's Ex Parte In Camera Submission in Support of its Motion to Reduce Sentence in Weaver's case, in which the government advised the Court of the extent and substance of Weaver's assistance. On this record, there is no evidence that the United States ever undervalued or altered its assessment of the value of Weaver's cooperation as a result of Mundy's efforts to persuade the government that there was no conflict of interest.[17]

### 2. Defendant Was Never Guaranteed a Rule 35(b) Motion

Weaver claims that "he had a right to rely upon paragraph 14 of his plea agree-

ment, and he had a right to effective assistance of counsel at that precise time." Def. Closing at 34. According to Weaver, since "that time has long passed," and the Court cannot restore those rights retroactively, the only available remedy for the breach is withdrawal of his plea and a reversal of his conviction. Def. Closing at 34.

However, paragraph 14 of the plea agreement clearly states that "Gerald W. Weaver has no right to compel or require that the United States will file" a Rule 35(b) motion. The express terms of this paragraph left the decision of whether or not to file such a motion entirely within the government's discretion. *See* Plea Agreement ¶ 14 ("If the United States Attorney determines that Gerald W. Weaver II has provided substantial assistance in the investigation or prosecution of other persons, the United States Attorney, *may, in his discretion,* file motions under Title 18 U.S.C. Sec. 3553(e), and Rule 35(b), Federal Rules of Criminal Procedure advising the District Court of the assistance to law enforcement authorities. Gerald W. Weaver has no right to compel or require that the United States Attorney will file such a motion.") (emphasis added). There is no allegation by defendant, nor is there any evidence in the record to suggest that, defendant did not understand this language.[18] In fact, the record shows that the plea agreement was reviewed in substantial detail and that Weaver expressed both understanding and willingness to sign the agreement. *See* Tr. 3/31/93 at 10–13; *see also* Tr. 3/10/00 at 80–81. On this record, defendant cannot claim any entitlement to a Rule 35(b) motion.

Since Mr. Weaver had no entitlement to such a motion and since there is no evi-

---

**17.** Furthermore, there is no evidence on the record that the "informal discussions" between the prosecutors and Mundy during the summer of 1994 actually resulted in what Weaver calls "a parade of prejudices and breaches of confidences." *See* Def. Closing at 24.

**18.** Defendant has explicitly acknowledged his understanding of this plea agreement. *See* Def. Reply to Government's Closing at 4 ("He certainly understood the plea as it was written . . . .")

dence that the motion would have been filed earlier had Mundy not entered his appearance for Rostenkowski, there is insufficient evidence of "adverse impact" in this case to justify a reversal of Weaver's convictions.

### 3. Reversal is Not Automatic

Weaver argues that reversal of his convictions "is automatic" since "the Mundy conflict of interest was never the subject of any inquiry, prompt or otherwise by the trial judge, contrary to the requirements of Fed.R.Crim.P. 44 and *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)." Def. Closing at 6, 21–26. This Court disagrees.

First, Rule 44(c), as written, concerns two or more defendants that have been jointly charged pursuant to Fed.R.Crim.P. 8, or have been joined for trial pursuant to Fed.R.Crim.P. 13. *See* Fed.R.Crim.P. 44(c). Similarly, the *Wheat* decision focuses exclusively on the issue of potential conflicts of interest where two co-defendants joined for trial are being represented by the same attorney. Weaver and Rostenkowski were not jointly charged, nor were they joined for trial. Therefore, neither Rule 44(c) nor the *Wheat* decision has any applicability here.

Second, the remedy sought by the United States for Mundy's conflict of interest was his disqualification from further representation of Congressman Rostenkowski, not a withdrawal of Weaver's pleas. *See* Motion to Disqualify at 25; *see also* Tr. 3/10/00 at 24. A motion to disqualify is governed by entirely different legal standards from a motion to vacate, set aside, and reverse conviction. Without any evidence at all of adverse effect to Weaver's case, there is simply no basis for withdrawing his pleas and vacating his convictions.

Weaver would have this Court withdraw his pleas and vacate his convictions based upon nothing more than mere speculation that his sentence could possibly have been a month or two shorter.[19] There is no evidence to support Weaver's assertions. Considering the charges Weaver was facing if he went to trial and the evidence the government had against him, the Court finds Weaver's actual term of incarceration to be quite lenient.[20] Although the Court recognizes that a conflict of interest may have existed in Weaver's case, without any evidence of "adverse impact" the Court cannot simply grant an automatic reversal of this defendant's convictions. In the absence of any evidence of manifest injustice or adverse effect, the Court finds a withdrawal of defendant's guilty pleas and a reversal of his convictions unwarranted.[21]

19. Weaver also argues that the Court is obligated to vacate his convictions in order to send the message that it does not condone breaches of legal ethics. The Court will not respond to this statement, except to remind Weaver that he himself was a licensed attorney who pled guilty to conspiracy to distribute a controlled substance, distribution of a controlled substance, and obstruction of justice. Perhaps, Weaver is not in the best position to be preaching about legal ethics.

20. Weaver's total imprisonment was less than seventeen months. This figure is less than what Mundy, prior to his alleged conflict of interest, requested at sentencing when he asked the Court to grant an additional one-point guideline reduction for Weaver's cooperation, *see* Tr. 6/30/93 at 29–31, and even lower than the sentence advocated by Bachner, whose allegiance and effectiveness have not been questioned, *see* Def. Response to Government's Rule 35(b) Motion (requesting a sentence of 18 months).

21. Since there is no evidence of adverse impact, the Court also cannot accept the government's suggestion that Weaver's remaining term of supervised release be vacated. The Court understands that Weaver himself may have cured any potential prejudice by hiring a new attorney to petition the government for a Rule 35(b) motion. However, the role of this Court is merely to look for adverse impact, not to analyze how the adverse effect was avoided. Therefore, the fact that Weaver may have prevented his own prejudice does not change the Court's analysis. It is possible that Weaver may prevail in his malpractice case against Mundy's estate; this may be where his remedy lies. However, that is not at issue here. This is a case under 28 U.S.C.

12

## III. CONCLUSION

For the foregoing reasons, defendant's Motion to Set Aside, Vacate, and Reverse Judgment of Conviction pursuant to 28 U.S.C. § 2255 is denied in its entirety. An order will accompany this opinion.

### *ORDER*

In accordance with the accompanying memorandum opinion, it is hereby

**ORDERED** that defendant Gerald W. Weaver II's Motion to Set Aside, Vacate, and Reverse Judgment of Conviction, pursuant to 28 U.S.C. § 2255 is **DENIED**. It is further

**ORDERED** that civil action number 97–370 is **DISMISSED WITH PREJUDICE**. And it is further hereby

**ORDERED** that this Order constitutes the final appealable order in this case.

§ 2255, and under those standards and the prevailing caselaw, the Court cannot find sufficient evidence of manifest injustice or adverse effect to warrant a withdrawal of Weaver's pleas and a reversal of his convictions.